EASTERBROOK, Circuit Judge.
The City of Highland Park has an ordinance (§ 136.005 of the City Code) that prohibits possession of assault weapons or large-capacity magazines (those that can accept more than ten rounds). The ordinance defines an assault weapon as any semi-automatic gun that can accept a large-capacity magazine and has one of five other features: a pistol grip without a stock (for semiautomatic pistols', the capacity to accept a magazine outside the pistol grip); a folding, telescoping, or thumbhole stock; a grip for the non-trigger hand; a barrel shroud; or a muzzle brake or compensator. Some weapons, such as AR-15s and AK-47s, are prohibited by name. Arie Friedman, who lives in Highland Park, owned a banned rifle and several large-capacity magazines before the ordinance took effect, and he wants to own these items again; likewise members of the Illinois State Rifle Association, some of whom live in Highland Park. Plaintiffs asked the district court to enjoin enforcement of the ordinance, arguing that it violates the Con-stitution’s Second Amendment, see District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), applied to the states by the Fourteenth. See McDonald v. Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Heller holds that a law banning the possession of handguns in the home (or making their use in the home infeasible) violates the individual right to keep and bear arms secured by the Second Amendment. But the Court added that this is not a “right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” 554 U.S. at 626, 128 S.Ct. 2783. It cautioned against interpreting the decision to cast *408 doubt on “longstanding prohibitions”, including the “historical tradition of prohibiting the carrying of ‘dangerous and unusual weapons’ Id. at 623, 627, 128 S.Ct. 2783. It observed that state militias, when called to service, often had asked members to come armed with the sort of weapons that were “in common use at the time”, id. at 624, 128 S.Ct. 2783, and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia’s armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not. Id. at 624-25, 128 S.Ct. 2783.
Plaintiffs contend that there is no “historical tradition” of banning possession of semi-automatic guns and large-capacity magazines. Semi-automatic rifles have been marketed for civilian use for over a hundred years; Highland Park’s ordinance was enacted in 2013. But this argument proves too much: its logic extends to bans on machine guns (which can fire more than- one round with a single pull of the trigger, unlike semi-automatic weapons that chamber a new round automatically but require a new pull to fire). Heller deemed a ban on private possession of machine guns to be obviously valid. 554 U.S. at 624, 128 S.Ct. 2783. But states didn’t begin to regulate private use of machine guns until 1927. See Notes to Uniform Machine Gun Act, Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Forty-Second Annual Conference 427-28 (1932). The National Firearms Act, 48 Stat. 1236, regulating machine guns at the federal level, followed in 1934.
How weapons are sorted between private and military uses has changed over time. From the perspective of 2008, when Heller was decided, laws dating to the 1920s may seem to belong to a “historical tradition” of regulation. But they were enacted more than 130 years after the states ratified the Second Amendment. Why should regulations enacted 130 years after the Second Amendment’s adoption (and nearly 60 years after the Fourteenth’s) have more validity than those enacted another 90 years later? Nothing in Heller suggests that a constitutional challenge to bans on private possession of machine guns brought during the 1930s, soon after their enactment, should have succeeded — that the passage of time creates an easement across the Second Amendment. See United States v. Skoien, 614 F.3d 638 (7th Cir.2010) (en banc). If Highland Park’s ordinance stays on the books for a few years, that shouldn’t make it either more or less open to challenge under the Second Amendment.
Plaintiffs ask us to distinguish machine guns from semiautomatic weapons on the ground that the latter are commoniy owned for lawful purposes. Cf. Heller, 554 U.S. at 625, 128 S.Ct. 2783. This does not track the way Heller distinguished United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939): The Court took from Miller the rule that the Second Amendment does not authorize private persons to possess weapons such as machine guns and sawed-off shotguns that the government would not expect (or allow) citizens to bring with them when the militia is called to service. During Prohibition the Thompson submachine gun (the “Tommy gun”) was all too common in Chicago, but that popularity didn’t give it a constitutional immunity from the federal prohibition enacted in 1934. (The Tommy gun is a machine gun, as defined by 18 U.S.C. § 921(23) and 26 U.S.C. § 5845(b), and generally forbidden by, 18 U.S.C. § 922(a)(4), because it fires multiple rounds with a single pull of the trigger; like the Uzi it is called a “submachine gun” *409 to indicate that it is smaller and more mobile than other machine guns. The AK-47 and AR-15 (M16) rifles in military-use also are submachine guns, though civilian versions are restricted to semi-automatic fire.) Both Heller and Miller contemplated that the weapons properly in private hands for militia use might change through legal regulation as well as innovation by firearms manufacturers.
And relying on how common a weapon is at the time of litigation would be circular to boot. Machine guns aren’t commonly owned for lawful purposes today because they are illegal; semi-automatic weapons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn’t commonly owned. A law’s existence can’t be the source of its own constitutional validity.
Highland Park contends that the ordinance must be valid because weapons with large-capacity magazines are “dangerous and unusual” as Heller used that phrase. Yet Highland Park concedes uncertainty whether the banned weapons are commonly owned; if they are (or were before it enacted the ordinance), then they are not unusual. The record shows that perhaps 9% of the nation’s firearms owners have assault weapons, but what line separates “common” from “uncommon” ownership is something the Court did not say. And the record does not show whether the banned weapons are “dangerous” compared with handguns, which are responsible for the vast majority of gun violence in the United States: nearly as many people are killed annually with handguns in Chicago alone as have been killed in mass shootings (where use of a banned weapon might make a difference) nationwide in more than a decade. See Research and Development Division, 2011 Chicago Murder Analysis, Chicago Police Department 23 (2012); J. Pete Blair & Katherine W. Schweit, A Study of Active Shooter Incidents in the United States Between 2000 and 2013, Federal Bureau of Investigation, United States Department of Justice 9 (2014).
The large fraction of murders committed by handguns may reflect the fact that they are much more numerous than assault weapons. What should matter to the “danger” question is how deadly a single weapon of one kind is compared with a single weapon of a different kind. On that subject the record provides some evidence. We know, for example, that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines. We also know that assault weapons generally are chambered for small rounds (compared with a large-caliber handgun or rifle), which emerge from the barrel with less momentum and are lethal only, at (relatively) short range. This suggests that they are less dangerous per bullet — but they can fire more bullets. And they are designed to spray fire rather than to be aimed carefully. That makes them simultaneously more dangerous to bystanders (and targets of aspiring mass murderers) yet more useful to elderly householders and others who are too frightened to draw a careful bead on an intruder or physically unable to do so. Where does the balance of danger lie?
The problems that would be created by treating such empirical issues as for the judiciary rather than the legislature — and the possibility that different judges might reach dramatically different conclusions about relative risks and their constitutional significance — illustrate why courts should not read Heller like a statute rather than an explanation of the Court’s disposition. *410 The language from Heller that we have quoted is precautionary: it warns against readings that go beyond the scope of Heller ’s holding that “the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense.” Skoien, 614 F.3d at 640.
Heller does not purport to define the full scope of the Second Amendment. The Court has not told us what other entitlements the Second Amendment creates or what kinds of gun regulations legislatures may enact. Instead the Court has alerted other judges, in Heller and again in McDonald, that the Second Amendment “does not imperil every law regulating firearms.” McDonald, 561 U.S. at 786, 130 S.Ct. 3020 (plurality opinion); Heller, 554 U.S. at 626-27 & n. 26, 128 S.Ct. 2783. Cautionary language about what has been left open should not be read as if it were part of the Constitution or answered all possible questions. It is enough to say, as we did in Skoien, 614 F.3d at 641, that at least some categorical limits on the kinds of weapons that can be possessed are proper, and that they need not mirror restrictions that were on the books in 1791.
This does not imply that a law about firearms is proper if it passes the rational-basis test — that is, as long as it serves some conceivable valid function. See, e.g., Vance v. Bradley, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). All legislation requires a rational basis; if the Second Amendment imposed only a rational basis requirement, it wouldn’t do anything. So far, however, the Justices have declined to specify how much substantive review the Second Amendment requires. Two courts of appeals have applied a version of “intermediate scrutiny” and sustained limits on assault weapons and large-capacity magazines. See Heller v. District of Columbia, 670 F.3d 1244 (D.C.Cir.2011) (a law materially identical to Highland Park’s is valid); Fyock v. Sunnyvale, 779 F.3d 991 (9th Cir.2015) (a ban on magazines holding more than ten rounds is valid). But instead of trying to decide what “level” of scrutiny applies, and how it works, inquiries that do not resolve any concrete dispute, we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have “some reasonable relationship to the preservation or efficiency of a well regulated militia,” see Heller, 554 U.S. at 622-25, 128 S.Ct. 2783; Miller, 307 U.S. at 178-79, 59 S.Ct. 816, and whether law-abiding citizens retain adequate means of self-defense.
The features prohibited by Highland Park’s. ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren’t widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments. Barrel shrouds, which make guns easier to operate even if they overheat, also are new; slow-loading guns available in 1791 did not overheat. And muzzle brakes, which prevent a gun’s barrel from rising in recoil, are an early 20th century innovation.
Some of the weapons prohibited by the ordinance are commonly used for military and police functions; they therefore bear a relation to the preservation and effectiveness of state militias. But states, which are in charge of militias, should be allowed to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty. (Recall that this is how Heller understood Miller.) And since plaintiffs do not distinguish between states and other units of local government — according to them, an identical ban enacted by the State of Illinois would also run afoul of the *411 Second Amendment — we need not decide whether only states, which traditionally regulate militias, have the power to determine what kinds of weapons citizens should have available. (Such an argument might anyway have been foreclosed by Illinois’ recognition that local assault-weapon bans enacted before July 19, 2013, are valid; see 430 ILCS 65/13.1(c).)
Since the banned weapons can be used for self-defense, we must consider whether the ordinance leaves residents of Highland Park ample means to exercise the “inherent right of self-defense” that the Second Amendment protects. Heller, 554 U.S. at 628, 128 S.Ct. 2783. Heller held that the availability of long guns does not save a ban on handgun ownership. The Justices took note of some of the reasons, including ease of accessibility and use, that citizens might prefer handguns to long guns for self-defense. But Heller did not foreclose the possibility that allowing the use’ of most long guns plus pistols and revolvers, as Highland Park’s ordinance does, gives householders adequate means of defense.
Plaintiffs argue that the ordinance substantially restricts their options for armed self-defense. But that contention is undermined by their argument, in the same breath, that the ordinance serves no purpose, because (they say) criminals will just substitute permitted firearms functionally identical to the banned guns. If criminals can find substitutes for banned assault weapons, then so can law-abiding homeowners. Unlike the District of Columbia’s ban on handguns, Highland Park’s ordinance leaves residents with many self-defense options.
True enough, assault weapons can be beneficial for self-defense because they are lighter than many rifles and less dangerous per shot than large-caliber pistols or revolvers. Householders too frightened or infirm to aim carefully may be able to wield them more effectively than the pistols James Bond preferred. But assault weapons with large-capacity magazines can fire more shots, faster, and thus can be more dangerous in aggregate. Why else are they the weapons of choice in mass shootings? A ban on assault weapons and large-capacity magazines might not prevent shootings in Highland Park (where they are already rare), but it may reduce the carnage if a mass shooting occurs.
That laws similar to Highland Park’s reduce the share of gun crimes involving assault weapons is established by data. See Christopher S. Koper, Daniel J. Woods & Jeffery A. Roth, An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1991-2003, Report to the National Institute of Justice, United States Department of Justice 39-60 (June 2004). There is also some evidence linking-the availability of assault weapons to gun-related homicides. See Arindrajit Dube, Oeindrila Dube & Omar Garcia-Ponce, Cross-Border Spillover: U.S. Gun Laws and Violence in Mexico, 107 Am. Pol. Sci. Rev. 397 (2013) (finding that Mexican municipalities bordéring American states without assault weapons bans experienced more gun-related homicides than those bordering California, which had a ban).
Plaintiffs nonetheless contend that the ordinance will have no effect on gun violence because the sort of firearms banned in Highland Park are available elsewhere in Illinois and in adjacent states. But data show that most criminals commit crimes close to home. See Elizabeth Groff & Tom McEwen, Exploring the Spatial Configuration of Places Related to Homicide Events, Report to the National Institute of Justice, United States Department of Justice 5-10, 48-56 (March 2006) (homicide); Christophe Vandeviver, Stijn Van Daele & *412 Tom Vander Beken, What Makes Long Crime Trips Worth Undertaking? Balancing Costs and Benefits in Burglars’ Journey to Crime, 55 Brit. J. Criminology 399, 401, 406-07 (2015) (burglary). Local crimes are most likely to be committed by local residents, who are less likely to have access to firearms banned by a local ordinance. A ban on assault weapons won’t eliminate gun violence in Highland Park, but it may reduce the overall dangerousness of crime that does occur. Plaintiffs’ argument proves far too much: it would imply that no jurisdiction other than the United States as a whole can regulate firearms. But that’s not what Heller concluded, and not what we have held for local bans on other substances. See National Paint & Coatings Ass’n v. Chicago, 45 F.3d 1124 (7th Cir.1995) (spray paint).
If it has no other effect, Highland Park’s ordinance may increase the public’s sense of safety. Mass shootings are rare, but they are highly salient, and people tend to overestimate the likelihood of salient events. See George F. Loewenstein, Christopher K. Hsee, Elke U. Weber & Ned Welch, Risk as Feelings, 127 Psychological Bulletin 267, 275-76 (2001); Eric J. Johnson, John Hershey, Jacqueline Meszaros & Howard Kunreuther, Framing, Probability Distortions, and Insurance Decisions, 7 J. Risk & Uncertainty 35 (1993). If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that’s a substantial benefit. Cf. Frank v. Walker, 768 F.3d 744, 751 (7th Cir.2014).
McDonald holds that the Second Amendment creates individual rights that can be asserted against state and local governments. But neither it nor Heller attempts to define the entire scope of the Second Amendment — to take all questions about which weapons are appropriate for self-defense out of the people’s hands. Heller and McDonald set limits on the regulation of firearms; but within those limits, they leave matters open. The best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate, not by parsing ambiguous passages in the Supreme Court’s opinions. The central role of representative democracy is no less part of the Constitution than is the Second Amendment: when there is no definitive constitutional rule, matters are left to the legislative process. See McCulloch v. Maryland, 4 Wheat. 316, 17 U.S. 316, 407, 4 L.Ed. 579 (1819).
Another constitutional principle is relevant: the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity. McDonald circumscribes the scope of permissible experimentation by state and local governments, but it does not foreclose all possibility of experimentation. Within the limits established by the Justices in Heller and McDonald, federalism and diversity still have a claim. Whether those limits should be extended is in the end a question for the Justices. Given our understanding of existing limits, the judgment is
AFFIRMED.