KING, Circuit Judge,
wrote an opinion dissenting as to Part III and concurring in the judgment as to Parts IV and V:
There is sound reason to conclude that the Second Amendment affords no protection whatsoever to the assault rifles and shotguns, copycat weapons, and large-capacity detachable magazines that are banned by the State of Maryland. Assuming, however, that Maryland’s Firearm Safety Act (the “FSA”) burdens the Second Amendment right, it is, put most succinctly, subject to nothing more than intermediate scrutiny. Indeed, no precedent of the Supreme Court or our own Court compels us to rule otherwise. And the suitability of intermediate scrutiny is confirmed by cogent decisions of other courts of appeals. I therefore dissent insofar as the panel majority — charting a course today that divides us from our sister circuits— vacates the district court’s denial of the Plaintiffs’ Second Amendment claims and remands for an application of strict scrutiny.
Although I am dissenting from the panel majority’s reinstatement of the Second Amendment claims pressed by the Plaintiffs, I concur in the judgment to the extent that we affirm the district court’s denial of the Plaintiffs’ claims that the FSA violates the Equal Protection Clause of the Fourteenth Amendment and is unconstitutionally vague. I would, in sum, wholly affirm the judgment of the district court on the basis of its summary judgment decision, which I commend unreservedly. See Kolbe v. O’Malley, 42 F.Supp.3d 768 (D.Md.2014).[1]
*193 I.
A.
Let’s be real: The assault weapons banned by Maryland’s FSA are exceptionally lethal weapons of war. In fact, the most popular of the prohibited semiautomatic rifles, the AR-15, functions almost identically to the military’s fully automatic M16. Significantly, the Supreme Court in its seminal Heller decision singled out “M-16 rifles and the like,” i.e., arms “that are most useful in military service,” as being “dangerous and unusual weapons” not even protected by the Second Amendment. See District of Columbia v. Heller, 554 U.S. 570, 624-25, 627, 128 S.Ct. 2788, 171 L.Ed.2d 637 (2008) (recognizing “that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns [and machine-guns]”). Similar to the district court — and unlike the panel majority — I am far from convinced that the Second Amendment reaches the AR-15 and other assault weapons prohibited under Maryland law, given their military-style features, particular dangerousness, and questionable utility for self-defense. See Kolbe, 42 F.Supp.3d at 788 (“Upon review of all the parties’ evidence, the court seriously doubts that the banned assault long guns are commonly possessed for lawful purposes, particularly self-defense in the home, ... and is inclined to find the weapons fall outside Second Amendment protection as dangerous and unusual.”).
That the banned assault weapons are not constitutionally protected finds considerable support in the record, which includes the following evidence:
• The AR-15 and other banned assault weapons, like their military counterparts, “are firearms designed for the battlefield, for the soldier to be able to shoot a large number of rounds across a battlefield at a high rate of speed.” See J.A. 206. The military-style features of those weapons include folding or telescoping stocks, pistol grips, flash suppressors, grenade launchers, night sights, and the ability to accept detachable magazines and bayonets. Their design results in “a capability for lethality — more wounds, more serious, in more victims — far beyond that of other firearms in general, including other semiautomatic guns.” See id. at 1121-22.
• The sole difference between the M16 and the AR-15 is that the M16 is capable of automatic fire while the AR-15 is semiautomatic. That difference is slight, in that automatic firing of all the ammunition in a thirty-round magazine takes two seconds, whereas a semiautomatic rifle can empty the same magazine in about five seconds. Moreover, soldiers and police officers are often advised to choose semiautomatic fire, because it is more accurate and lethal than automatic fire in many combat and law enforcement situations.
• The banned assault rifles and shotguns constitute no more than 3% of the civilian gun stock, and ownership of such weapons is concentrated in less than 1% of the U.S. population. At the same time, assault weapons are used disproportionately to their ownership in mass shootings and the mur *194 ders of police officers, and they cause more fatalities and injuries than other firearms.
• Maryland was inspired to enact the FSA by the December 14, 2012 mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, where the gunman used an AR-15-style assault rifle to shoot his way into the locked building and then murder twenty first-graders and six educators in less than eleven minutes. That horrific event was preceded and has been followed by mass shootings across the nation.
• Criminals armed with the banned assault weapons possess a “military-style advantage” in firefights with law enforcement, as such weapons “allow criminals to effectively engage law enforcement officers from great distances (far beyond distances usually involved in civilian self-defense scenarios),” “are more effective than handguns against soft body armor,” and “offer the capacity to fire dozens of highly-lethal rounds without having to change magazines.” See J.A. 265.
• The banned assault weapons also can be more dangerous to civilians than other firearms. For example, “rounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials,” and, when they do so, are more effective than rounds fired from handguns. See J.A. 279. Additionally, untrained users of assault weapons tend to fire more rounds than necessary, increasing the risk to bystanders.
• Although self-defense is a conceivable use of the banned assault weapons, most people choose to keep other firearms for self-defense, and assault-weapon owners generally cite reasons other than self-defense for owning assault weapons. There is no known incident of anyone in Maryland using an assault weapon for self-defense.
In these circumstances, I am entirely unable to discern a reasonable basis for saying that, although the M16 is a dangerous and unusual weapon, the AR-15 and similar arms are not. As the panel majority would have it, since all firearms are dangerous, the dangerous-and-unusual standard is really only concerned with whether a given firearm is unusual, i.e., “not in common use or typically possessed by the citizenry.” See ante at 177-78. Pursuant to the majority’s view, because M16s have long been outlawed while AR-15s have in some places been allowed, the AR-15 enjoys Second Amendment protection that the M16 is denied. Accord Friedman v. City of Highland Park, 784 F.3d 406, 416 (7th Cir.2015) (Manion, J., dissenting) (“In the case of machine guns, nobody has argued, before or since, that ordinary citizens used these weapons for lawful purposes, and so they have been rightly deemed not to fall within the ambit of the Second Amendment. Had there been even a small amount of citizens who used them for lawful purposes, then the Second Amendment might have covered them.”).
There are significant problems with the panel majority’s conception of the dangerous-and-unusual standard. First of all, even accepting that an “unusual” weapon is one that is not commonly possessed, “what line separates ‘common’ from ‘uncommon’ ownership is something the [Heller] Court did not say.” See Friedman, 784 F.3d at 409 (Easterbrook, J., writing for the court). Moreover,
relying on how common a weapon is at the time of litigation would be circular.... Machine guns aren’t commonly owned for lawful purposes today because they are illegal; semi-automatic weap *195 ons with large-capacity magazines are owned more commonly because, until recently (in some jurisdictions), they have been legal. Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn’t commonly owned. A law’s existence can’t be the source of its own constitutional validity.
Id.; see also Br. of Appellees 17 (“Focusing ... solely on the number or popularity of firearms owned would make the constitutionality of a ban dependent on the time at which it was enacted, with particularly dangerous weapons suddenly becoming entitled to ‘constitutional protection upon reaching an imaginary constitutional nu-merosity threshold, but less dangerous firearms permitted to be forever restricted if banned early enough.” (internal quotation marks omitted)). It follows that the term “unusual” most likely does not have the meaning accorded to it by my colleagues.
Another significant problem with the panel majority’s conception of the dangerous-and-unusual standard is that it renders the word “dangerous” superfluous, on the premise that all firearms are dangerous. In the course of doing so, the majority rejects the State’s contention that weapons lacking Second Amendment protection are “unusually dangerous” ones. More specifically, the majority asserts that the unusually dangerous benchmark finds no support in Heller and would be too difficult to apply. But the Heller Court surely had relative dangerousness in mind when it repudiated Second Amendment protection for short-barreled shotguns and “weapons that are most useful in military service— M-16 rifles and the like.” See Heller, 554 U.S. at 624-25, 627, 128 S.Ct. 2783 (internal quotation marks omitted). Furthermore, the unusually dangerous benchmark is no more difficult to apply than, for example, the majority’s dubious test of whether a weapon is “not in common use” and thus “unusual.”
That is not to say that it is easy to answer the question of whether the assault weapons prohibited by Maryland’s FSA are protected by the Second Amendment. Nor is it clear whether the Second Amendment protects the banned large-capacity detachable magazines, or “LCMs.”[2]
The Supreme Court recently declined to expound on those issues when it denied certiorari in the Seventh Circuit’s Friedman case. See Friedman v. City of Highland Park, — U.S. —, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015). Other of the federal courts of appeals have considered ■bans similar to Maryland’s, discussed the complexity of the issue of Second Amendment coverage, and ultimately assumed— but not decided — that constitutional protection may be afforded to assault weapons and LCMs. See N.Y. State Rifle & Pistol *196 Ass’n, Inc. v. Cuomo, 804 F.3d 242, 257 (2d Cir.2015); Heller v. District of Columbia, 670 F.3d 1244, 1261 (D.C.Cir.2011) (“Heller II”). The district court likewise resolved to assume without deciding that the FSA “places some burden on the Second Amendment right.” See Kolbe, 42 F.Supp.3d at 789. Although I am strongly inclined to instead proclaim that the Second Amendment is not implicated by the FSA, I will, as explained below, refrain from doing so.
B.
We need not decide today whether the banned assault weapons and large-capacity detachable magazines are protected by the Second Amendment, because — following the lead of our colleagues on the Second and District of Columbia Circuits — we can assume they are so protected and yet rule that Maryland’s FSA passes constitutional muster under the highest appropriate level of scrutiny: that is, the concept of intermediate scrutiny. See N.Y. State Rifle & Pistol Ass’n, 804 F.3d at 257-64; Heller II, 670 F.3d at 1261-64; see also Kolbe, 42 F.Supp.3d at 789-97. Notably, not a single court of appeals has ever — until now— deemed strict scrutiny to be applicable to a firearms regulation along the lines of the FSA.[3] Indeed, in the wake of Heller, only the Sixth Circuit has applied strict scrutiny to any firearms regulation (there, a prohibition on the possession of firearms by a person who has been committed to a mental institution), and that decision was vacated by the court’s grant of rehearing en banc. See Tyler v. Hillsdale Cty. Sheriffs Dep’t, 775 F.3d 308 (6th Cir.2014), vacated, No. 13-1876 (6th Cir. Apr. 21, 2015), ECF No. 50.
Employing no more than intermediate scrutiny in our constitutional analysis of the FSA is not only counselled by decisions of other courts of appeals, it is also entirely consistent with binding precedent. Puzzlingly, however, the panel majority deems itself “compelled by” the Supreme Court’s decisions in Heller and McDonald v. City of Chicago, as well as our own post-Heller decisions, to apply strict scrutiny. See ante at 168. Of course, as our good Chief Judge previously explained, “Heller left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context.” See United States v. Chester, 628 F.3d 673, 682 (4th Cir.2010); see also N.Y. State Rifle & Pistol Ass’n, 804 F.3d at 253 (“The [Heller] Court did imply that [Second Amendment] challenges are subject to one of ‘the standards of scrutiny that we have applied to enumerated constitutional rights,’ though it declined to say which....” (quoting Heller, 554 U.S. at 628, 128 S.Ct. 2783)). McDonald did not amplify Heller’s analysis, but instead illuminated only “that the Second Amendment right is fully applicable to the States.” See 561 U.S. 742, *197 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Consequently, neither Heller nor McDonald can be read to require or demand strict scrutiny in this case.
Furthermore, our post-Heller decisions — particularly United States v. Mas-ciandaro, 638 F.3d 458 (4th Cir.2011), and Woollard v. Gallagher, 712 F.3d 865 (4th Cir.2013) — do not compel an application of strict scrutiny to each and every restriction on the right of self-defense in the home. According to the panel majority, Masciandaro “noted” that “ ‘any law that would burden the “fundamental,” core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny,’ ” ante at 181 (quoting Mascian-daro, 638 F.3d at 470), while Woollard “observ[ed]” that “restrictions on ‘the right to arm oneself at home’ necessitate[ ] the application of strict scrutiny,” id. (quoting Woollard, 712 F.3d at 878). Actually, however, Masciandaro did not note, it merely “assume[d] that any law that would burden the ‘fundamental,’ core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny.” See 638 F.3d at 470 (emphasis added). And Woollard did not observe, it simply described the plaintiffs’ (rejected) contention that “the right to arm oneself in public [is] on equal footing with the right to arm oneself at home, necessitating that we apply strict scrutiny in our review of [an outside-the-home regulation].” See 712 F.3d at 878; see also id. at 876 (reiterating that Masciandaro did nothing more than “ ‘assume’ ” that an inside-the-home regulation would be subject to strict scrutiny (quoting Masciandaro, 638 F.3d at 470)). Neither Masciandaro nor Woollard purported to, or had reason to, decide whether strict scrutiny always, or even ever, applies to regulations burdening the right of self-defense in the home. Those decisions do not provide even a smattering of support for the majority’s position on the level-of-scrutiny question.
We are thus left to conduct the analysis spelled out in our Chester decision for selecting between strict and intermediate scrutiny. Analogizing the Second Amendment to the First, Chester explained that “the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” See 628 F.3d at 682. Here, too, I part ways with the panel majority. Although I assume that the FSA implicates the “core protection” of the Second Amendment — “the right of law-abiding, responsible citizens to use arms in defense of hearth and home,” see Heller, 554 U.S. at 634-35, 128 S.Ct. 2783 — I simply cannot agree that the FSA sufficiently burdens that right to elicit strict scrutiny.
Contrary to the panel majority, the FSA does not, in banning certain assault weapons and detachable magazines, prohibit “an entire category of weaponry.” See ante at 180. Nor “might [the FSA] be ‘equivalent to a ban on a category of speech.’ ” See id. at 180 (quoting Heller II, 670 F.3d at 1285 (Kavanaugh, J., dissenting)). To support its theory, the majority carves out the popular AR-15 and its copies as “an entire class of semi-automatic rifles.” See id. at 180 n. 11. But, of course, a ban on one type of semi-automatic rifle does not equate to a prohibition on “an entire category of weaponry” in the same sense that, using the Heller example, a blanket ban on all handguns does. That fact — that the FSA does “not ban ‘an entire class of arms’ ” — renders “the restrictions substantially less burdensome.” See N.Y. State Rifle & Pistol Ass’n, 804 F.3d at 260 (quoting Heller, 554 U.S. at 628, 128 S.Ct. 2783).
Moreover, despite what the panel majority says, it does matter that the FSA *198 leaves handguns, as well as nonautomatic and some semiautomatic long guns, available for self-defense in the home. According to the majority, Heller “rejected essentially the same argument” when it dismissed the contention “ ‘that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.’ ” See ante at 180-81 (quoting Heller, 554 U.S. at 629, 128 S.Ct. 2783). The majority’s equation of this case and Heller is wholly untenable, because it depends on discount-1 ing the relevance of the handgun’s status as “the quintessential self-defense weapon” — a status that was obviously and unquestionably important to the Supreme Court. See Heller, 554 U.S. at 628-29, 128 S.Ct. 2783 (emphasizing that handguns are “overwhelmingly chosen by American society for [self-defense]”). To be sure, a ban on the possession of handguns is far more burdensome on the right of self-defense in the home than a prohibition on the possession of AR-15s and similar arms.
At bottom, I agree with the Second and District of Columbia Circuits “that ‘the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.’ The burden imposed by the challenged legislation is real, but it is not ‘severe.’ ” See N.Y. State Rifle & Pistol Ass’n, 804 F.3d at 260 (quoting Heller II, 670 F.3d at 1262). Accordingly, I would apply intermediate scrutiny and, in an analysis like that of the district court, uphold Maryland’s FSA as constitutional, in that it is reasonably adapted to a substantial government ■ interest. See Kolbe, 42 F.Supp.3d at 791-97 (concluding, inter alia, “that the ban on assault weapons is likely to further the government’s interest in protecting public safety by removing weapons that cause greater harm when used— to both civilians and police — and create greater obstacles for law enforcement in stopping and detaining criminals who are using them”). Simply put, the State has shown all that should be required: a reasonable, if not perfect, fit between the FSA and Maryland’s substantial interest in protecting the public safety and deterring criminal activity.
II.
To their credit, my colleagues declare their rejection of the Plaintiffs’ contention that, “once we determine that the prohibited firearms fall within the protective ambit of the Second Amendment, the [FSA] is unconstitutional and our analysis is at an end.” See ante at 178 n. 9. I fear, however, that by liberally extending constitutional protection to unusually dangerous arms and then decreeing strict scrutiny applicable to every ban on law-abiding citizens’ in-home possession of protected weapons, the panel majority has guaranteed the demise of the FSA and other sensible gun-control measures within this Circuit. After all, though strict scrutiny may not be “strict in theory, but fatal in fact,” see Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), it is at least “the most demanding test known to constitutional law,” see City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).
This grave matter calls to mind the thoughtful words of our esteemed colleague Judge Wilkinson, recognizing in Masciandaro the “serious business” of adjudicating the Second Amendment’s breadth: “We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights.” See 638 F.3d at 475. To put it mildly, it troubles *199 me that, by imprudently and unnecessarily breaking from our sister courts of appeals and ordering strict scrutiny here, we are impeding Maryland’s and others’ reasonable efforts to prevent the next New-town — or Virginia Tech, or Binghamton, or Fort Hood, or Tucson, or Aurora, or Oak Creek, or San Bernardino. In my view, any burden imposed by the FSA on the Second Amendment is far from severe. On the other hand, the State’s paramount interest in the protection of its citizenry and the public safety is profound indeed. Unfortunately, however, I find myself outvoted today.
In these circumstances, and because I strongly agree with the excellent decision of our distinguished district court colleague upholding the constitutionality of the FSA, I wholeheartedly dissent.

. In addition to a thoughtful and compelling analysis of the Second Amendment claims, the district court provided all the reasons needed to reject the equal protection and vagueness claims. See Kolbe, 42 F.Supp.3d at 797-99 (concluding that the FSA does not violate the Equal Protection Clause by excepting retired law enforcement officers from the assault-weapon and large-capacity-magazine bans, in "that retired law enforcement officers are differently situated by virtue of their experiences ensuring public safety and their *193 extensive training on the use of firearms”); id. at 799-803 (ruling that, because it imparts "sufficient notice of banned conduct,” including "what constitutes a ‘copy’ of the banned assault long guns,” the FSA is not unconstitutionally vague). As my good colleagues recognize, see ante at 184 n. 12, the district court also properly denied the Plaintiffs’ motion to exclude certain expert and fact evidence offered by the State.

. The State proffers two substantial grounds for ruling that LCMs are unprotected. First, LCMs could be deemed dangerous and unusual, in view of evidence that, inter alia, they "are particularly designed and most suitable for military and law enforcement applications.” See J.A. 891; see also, e.g., Kolbe, 42 F.Supp.3d at 787-88 (addressing the State’s evidence that LCMs "can allow a criminal to cause mass casualties, while depriving victims and law enforcement of an opportunity to escape or overwhelm an assailant as he reloads his weapon”). Second, it could be con-eluded that LCMs are not “arms” within the meaning of the Second Amendment and thus not eligible for its protection. See Heller, 554 U.S. at 582, 128 S.Ct. 2783 (observing that the Second Amendment extends to "bearable arms”); Br. of Appellees 26 ("A large-capacity detachable magazine is not an ‘arm’ ____ Indeed, large-capacity magazines are not even ammunition, but instead are devices used for feeding ammunition into firearms that can easily be switched out for other devices that are of lower capacity.... ”).

. In affirming the denial of a preliminary injunction in Fyock v. City of Sunnyvale, the v Ninth Circuit concluded that the district court neither "clearly err[ed] in finding ... that a regulation restricting possession of [LCMs] burdens conduct falling within the scope of the Second Amendment,” nor "abused its discretion by applying intermediate scrutiny or by finding that [the regulation] survived intermediate scrutiny.” See 779 F.3d 991, 998 (9th Cir.2015). Thereafter, in Friedman, the Seventh Circuit upheld the City of Highland Park's ban on assault weapons and LCMs, albeit without applying either intermediate or strict scrutiny. See 784 F.3d at 410 ("[instead of trying to decide what level of scrutiny applies, and how it works, ... we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense.” (internal quotation marks omitted)).