In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2686

MATTHEW D. WILSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

COOK COUNTY, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-07002 — **Manish S. Shah**, *Judge*.

ARGUED APRIL 4, 2019 — DECIDED AUGUST 29, 2019

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges*.

PER CURIAM. Two Cook County residents appeal the
dismissal of their complaint, which raises a Second Amend-
ment challenge to Cook County's ban on assault rifles and
large-capacity magazines. Less than five years ago, we up-
held a materially indistinguishable ordinance against a Sec-
ond Amendment challenge. *See Friedman v. City of Highland
Park*, 784 F.3d 406 (7th Cir. 2015). The district court dis-
missed the plaintiffs' complaint on the basis of *Friedman*. We

agree with the district court that *Friedman* is controlling. Because the plaintiffs have not come forward with a compelling reason to revisit our previous decision, we affirm the judgment of the district court.

## I.

## BACKGROUND

In November 2006, the Commissioners of Cook County enacted the Blair Holt Assault Weapons Ban ("the County Ordinance"), an amendment to the Cook County Deadly Weapons Dealer Control Ordinance. The amendment defines "assault weapon" and "large-capacity magazine," and makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" either item in Cook County. Cook County, Ill. Code §§ 54-211, 54-212(a). Any person who legally possessed an assault weapon or large-capacity magazine prior to enactment of the amendment must remove it from county limits, modify it to render it permanently inoperable, or surrender it to the Sheriff. *Id.* § 54-212(c). When a weapon or magazine is surrendered or confiscated, the ordinance requires the Sheriff to determine if it is needed as evidence, and, if not, to destroy it. *Id.* § 54-213(a)–(b). Violation of the County Ordinance is a misdemeanor; it carries a fine ranging from $5,000 to $10,000 and a term of imprisonment of up to six months. *Id.* § 54-214(a).

In September 2007, three Cook County residents, including the plaintiffs, brought a preenforcement action in Illinois state court, challenging the County Ordinance and seeking declaratory and injunctive relief. The complaint named as defendants the County, the individual commissioners of the

Cook County Board of Commissioners, and the Cook County Sheriff. The plaintiffs alleged that the ordinance violates the Due Process Clause because the definition of assault weapons is unconstitutionally vague (Count I); the ordinance fails to provide a scienter requirement and fails to give fair warning of the conduct proscribed (Count II); the ordinance is overbroad (Count III); the ordinance violates their right to bear arms under the Second Amendment (Count IV); the ordinance is an unconstitutional exercise of the County's police powers (Count V); and the ordinance violates the Equal Protection Clause because it arbitrarily classifies certain firearms (Count VI). The Circuit Court of Cook County dismissed the complaint, and the Illinois Appellate Court upheld the dismissal. The Supreme Court of Illinois affirmed the dismissal of the due process and equal protection claims; however, it remanded for further proceedings the plaintiffs' Second Amendment claim. *See Wilson v. Cty. of Cook*, 968 N.E.2d 641, 658 (Ill. 2012). Plaintiffs then voluntarily non-suited their Second Amendment claim prior to resolution on the merits.

In June 2013, the City of Highland Park, Illinois, also enacted an ordinance banning assault weapons and large-capacity magazines within city limits ("Highland Park Ordinance"). The Highland Park Ordinance defines "assault weapon" and "large-capacity magazine" in virtually identical terms as the County Ordinance does and proscribes the same conduct: it penalizes those who "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire or possess" any assault weapon or large-capacity magazine. Highland Park, Ill. Code § 136.005. The Highland Park Ordinance also requires those in possession of a banned item to remove it from city limits; to render it permanently inop-

erable or permanently alter it so that it no longer meets the
definition of assault weapon or large-capacity magazine; or
to surrender it to the Chief of Police. *Id.* § 136.020. The Chief
of Police, like the Cook County Sheriff, must destroy any as-
sault weapon or large-capacity magazine not needed as evi-
dence. *Id.* § 136.025. Highland Park punishes a violation of
its ordinance as a misdemeanor, and the violation carries a
fine of $500 to $1,000 and a maximum term of six months'
imprisonment. *Id.* § 136.999. Shortly after the Highland Park
Ordinance was adopted, a resident challenged the ordinance
on Second Amendment grounds, and we upheld the High-
land Park Ordinance against the constitutional challenge. *See
Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015).

On July 28, 2017, Matthew Wilson and Troy Edhlund re-
filed their challenge to the County Ordinance in Illinois state
court. As they had in their original complaint, they pleaded
a Second Amendment claim as well as the previously dis-
missed due process and equal protection claims to "pre-
serve[]" those claims "for appeal."[1] The defendants removed
the action to federal court on September 28, 2017.

Once in federal court, the district court granted the de-
fendants' motion to dismiss the complaint under Federal
Rule of Civil Procedure 12(b)(6). The court observed that the
Cook County Ordinance is "materially identical" to the

---

[1] R.2-1 at 6. It is not clear to us why the plaintiffs repleaded their claims
under the Due Process and Equal Protection Clauses. The Supreme
Court of Illinois affirmed the dismissal of those claims. *See Wilson v. Cty.
of Cook*, 968 N.E.2d 641, 658 (Ill. 2012). Any further review of those claims
must be sought in the Supreme Court of the United States. *See* 28 U.S.C.
§ 1257(a).

Highland Park Ordinance at issue in *Friedman*[2] and that *Friedman*, therefore, required the dismissal of the plaintiffs' Second Amendment claim.[3] The plaintiffs filed a timely notice of appeal.[4]

## II.

## DISCUSSION

The plaintiffs now submit to us that the district court should not have relied on *Friedman*. In their view, their situation is materially different from that of the *Friedman* plaintiffs, and they believe that they should have the opportunity to develop a factual record establishing those differences. In the alternative, they contend that *Friedman* was wrongly decided and that their claim should be evaluated under a test that tracks more closely the language that the Supreme Court employed in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and that we employed in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). We begin our consideration of the

---

[2] R.30 at 3.

[3] *Id*. at 7. Although the district court did not mention the plaintiffs' other claims in its memorandum opinion, it dismissed the plaintiffs' complaint in its entirety and entered a final judgment. *See* R.31. As previously noted, it is unclear what the plaintiffs were trying to accomplish by repleading their due process and equal protection claims. They made no mention of them either in their opposition to the defendants' motion to dismiss the complaint in the district court or in their briefing before this court.

[4] The district court had jurisdiction over the plaintiffs' constitutional claims pursuant to 28 U.S.C. §§ 1331, 1343. Our jurisdiction is secure under 28 U.S.C. § 1291.

plaintiffs' claim by reviewing *Heller*, *Ezell*, and *Friedman* in the developing landscape of Second Amendment jurisprudence.

**A**.

In *Heller*, the Supreme Court considered the constitutionality of the District of Columbia's ban on handguns. After reviewing the history of the Second Amendment, the Court explained that the right to bear arms "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. The Court further stated that the right was not unlimited: it "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. at 626. Consequently, the Court's holding did not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626–27.

Moreover, the Court explained, the Second Amendment was meant to protect the possession of weapons "in common use at the time" the Amendment was adopted. *Id*. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). It therefore did not preclude a ban on "the carrying of dangerous and unusual weapons." *Id*. (internal quotation marks omitted). The District of Columbia's ban, however, did not fall into one of these categories. Instead, "[t]he handgun ban amount[ed] to a prohibition of an entire class of 'arms' that [wa]s overwhelmingly chosen by American society" for the lawful purpose of self-defense. *Id.* at 628. Additionally, the prohibition extended to possession and use in the home,

"where the need for defense of self, family, and property is most acute." *Id*. Consequently, the Court concluded that the District's ban could not be reconciled with the guarantees of the Second Amendment.[5]

In *Ezell*, we applied *Heller* to the City of Chicago's treatment of firing ranges. At the outset, we acknowledged that, although *Heller* provided "general direction," *Ezell*, 651 F.3d at 700, "the standards for evaluating Second Amendment claims [we]re just emerging," *id*. at 690. We nevertheless took from *Heller* "several key insights about judicial review of laws alleged to infringe Second Amendment rights. First, the threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place?" *Id*. at 701.

> [I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment … the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.

*Id*. at 702–03. If, however, the government cannot meet this burden, then the court must "inquir[e] into the strength of

---

[5] In *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), the Court held "that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" and, consequently, states' attempts to regulate the use of firearms must conform to the requirements of the Second Amendment.

the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id*. at 703. The rigor of this inquiry "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id*. "[A] severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end." *Id*. at 708. However,

> laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified. How much more easily depends on the relative severity of the burden and its proximity to the core of the right.

*Id*.

Applying this framework, we could not conclude that "range training is categorically unprotected by the Second Amendment." *Id*. at 704. Moving to the second inquiry, we observed that "[t]he City's firing-range ban is not merely regulatory; it *prohibits* the 'law-abiding, responsible citizens' of Chicago from engaging in target practice in the controlled environment of a firing range." *Id*. at 708. "This," we explained, "[wa]s a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id*. The ban was especially problematic given that the City itself had placed special import on range training by making it a requirement for obtaining a permit to possess a firearm. *Id*. We concluded, therefore, that "a more

rigorous showing … should be required, if not quite 'strict scrutiny.'" *Id*. The City, however, had "not come close to satisfying" its "burden of establishing a strong public-interest justification for its ban on range training" and a "close fit between the range ban and the actual public interests it serves." *Id*. at 708–09.

Following *Ezell*, the question of the constitutionality of assault-weapons bans arose in two of our sister circuits, and those courts upheld the bans against Second Amendment challenges. As we had in *Ezell*, these courts considered "(1) how closely the law c[ame] to the core of the Second Amendment right; and (2) how severely, if at all, the law burden[ed] that right." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *see also Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1257 (D.C. Cir. 2011) (noting that "the level of scrutiny applicable under the Second Amendment surely depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right" (internal quotation marks omitted)). Although these bans may have "implicate[d] the core of the Second Amendment," the bans were "simply not as sweeping as the complete handgun ban at issue in *Heller*" and did "not affect the ability of law-abiding citizens to possess the quintessential self-defense weapon—the handgun." *Fyock*, 779 F.3d at 999 (internal quotation marks omitted). These courts therefore concluded that intermediate scrutiny was appropriate and, applying that level of scrutiny, further concluded that the ordinance was "substantially related to the compelling government interest in public safety." *Id*. at 1000 (internal quotation marks omitted); *see also Heller II*, 670 F.3d at 1262–63 (noting a lack of evidence "that semi-automatic rifles and magazines … are well-suited to or preferred for the purpose

of self-defense or sport," therefore applying intermediate scrutiny, and concluding that the evidence demonstrated that the ban was "likely to promote the Government's interest in crime control in the densely populated urban area that is the District of Columbia").

Our decision in *Friedman* built upon the experience of our sister circuits in applying *Heller* to assault-weapons bans. We began our consideration of the constitutionality of the Highland Park Ordinance by noting that, although "*Heller* d[id] not purport to define the full scope of the Second Amendment," it did make clear "that the Second Amendment 'does not imperil every law regulating firearms.'" *Friedman*, 784 F.3d at 410 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)). Moreover, we were able to deduce that, under *Heller*, "at least some categorical limits on the kinds of weapons that can be possessed are proper, and that they need not mirror restrictions that were on the books in 1791." *Id*. We observed that, in considering equivalent weapons bans, our sister circuits had attempted to discern what level of scrutiny should apply to an assault-weapons ban. *See id*. Their inquiries had been posed in the abstract, asking "(1) how closely the law comes to the core of the Second Amendment right; and (2) how severely, if at all, the law burdens that right." *Fyock*, 779 F.3d at 998. We, however, attempted to evaluate the Highland Park Ordinance in more "concrete" terms by asking: "whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Friedman*, 784 F.3d at 410 (quoting *Heller*, 554 U.S. at 622) (citations omitted). We then observed that "[t]he features pro-

hibited by Highland Park's ordinance were not common in 1791." *Id*. However, "[s]ome of the weapons prohibited by the ordinance are commonly used for military and police functions; they therefore bear a relation to the preservation and effectiveness of state militias." *Id*. We turned then to the question "whether the ordinance leaves residents of Highland Park ample means to exercise the 'inherent right of self-defense' that the Second Amendment protects." *Id*. at 411 (quoting *Heller*, 554 U.S. at 628). We noted that "*Heller* did not foreclose the possibility that allowing the use of most long guns plus pistols and revolvers, as Highland Park's ordinance does, gives householders adequate means of defense." *Id*. Moreover, we explained that, "[w]ithin the limits established by the Justices in *Heller* and *McDonald*, federalism and diversity still have a claim," and "[t]he best way to evaluate the relation among assault weapons, crime, and self-defense is through the political process and scholarly debate." *Id.* at 412. In short, because the Highland Park Ordinance did not strike at the heart of the Second Amendment, and because the residents of Highland Park were not left without a means of self-defense, the Constitution did not foreclose Cook County's efforts to preserve public safety.

**B**.

Returning to the plaintiffs' arguments, they contend that, in *Friedman*, the court was "able to, and did, consider facts specific to Highland Park, as well as the findings of the City Council, that provided the basis for its holding."[6] The same record, they assert, does not support the district court's

---

[6] Appellants' Br. 15.

judgment here. Moreover, they maintain that, if they were allowed to develop a factual record, it would reveal important, material distinctions between the residents of Highland Park and the residents of Cook County.

We are unpersuaded. The result in *Friedman* did not turn on any factual findings unique to Highland Park. For example, to address whether the ordinance banned weapons that are commonly owned, we referenced a national statistic. *Friedman*, 784 F.3d at 409 ("The record shows that perhaps 9% of the nation's firearms owners have assault weapons … ."). We also assessed the dangerousness of the prohibited weapons by discussing general evidence of the features of semi-automatic guns and large-capacity magazines. *Id.* Moreover, we did not limit our analysis to crime trends in Highland Park. *See id.* at 411 ("That laws similar to Highland Park's reduce the share of gun crimes involving assault weapons is established by data."). We did undertake inquiries specific to Highland Park's *ordinance*. *See, e.g., id.* at 410 (determining that "[t]he features prohibited by Highland Park's ordinance were not common in 1791"); *id.* at 411 (concluding that "Highland Park's ordinance leaves residents with many self-defense options"). However, the plaintiffs admit that the prohibitions imposed by the County Ordinance and the Highland Park Ordinance are materially indistinguishable. Consequently, there is no need for County-specific discovery regarding the plaintiffs' Second Amendment challenge.

The plaintiffs further argue that, to determine whether a particular ordinance impinges on residents' right to bear arms, we must consider crime statistics, population density, and demographics of the locality. Because "[t]he type, mag-

nitude and frequency of the criminal threats faced by the 5 million plus residents of Cook County … are likely to be very different from those confronted by the 29,000 residents of Highland Park,"[7] they submit that discovery is necessary to explore these disparities.

The failing in this argument is that our analysis in *Friedman* did not rest *at all* on the types or frequency of crime that a Highland Park resident may face. Such considerations never are mentioned, much less analyzed, in our decision. Our discussion of self-defense focused instead on the availability of other means for citizens to defend themselves. This is a question answered by the particular locality's laws, not by its crime rates. The plaintiffs have not come forward with *any* legal authority establishing that Cook County regulates the possession of firearms to a greater extent than was present in Highland Park.

## C.

Perhaps realizing the weakness in their initial argument, the plaintiffs dedicate the bulk of their brief to their second argument: *Friedman* was wrongly decided. They maintain that *Friedman* cannot be reconciled with *Heller* or *Ezell*.

We have stated repeatedly, and recently, that, absent a compelling reason, we will not overturn circuit precedent. *See, e.g.*, *Sotelo v. United States*, 922 F.3d 848, 852 (7th Cir. 2019); *United States v. Wolfe*, 701 F.3d 1206, 1217 (7th Cir. 2012) (reiterating that a "compelling reason" is required to overrule a circuit precedent). "[P]rinciples of stare decisis

---

[7] Appellants' Reply Br. 22.

require that we give considerable weight to prior decisions unless and until they have been overruled or undermined by the decisions of a higher court, or other supervening developments, such as a statutory overruling." *McClain v. Retail Food Emp'rs Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005) (internal quotation marks omitted).

The plaintiffs have not come forward with *any* authority or developments that postdate our *Friedman* decision that require us to reconsider that decision. Indeed, since *Friedman*, every court of appeals to have considered the issue has reached the same conclusion that we did: bans on assault weapons and large-capacity magazines do not contravene the Second Amendment. *See Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) (large-capacity magazines); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) (assault weapons); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015).[8]

Moreover, *Friedman* does not run afoul of *Heller*. The Court in *Heller* made clear that it was not "undertak[ing] an exhaustive historical analysis … of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626. Consequently, it "was not explicit about how Second Amendment challenges should be adjudicated." *Ezell*, 651 F.3d at 701. Nevertheless, the questions we posed in *Friedman* to assess

---

[8] The decisions of the Ninth and District of Columbia Circuits in *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), and *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011), respectively, also are consonant with *Friedman*, but predated that decision.

the constitutionality of the assault-weapons ban track the general guidance provided by the Court in *Heller*. For instance, in *Friedman*, we asked whether "a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'" 784 F.3d at 410 (quoting *Heller*, 554 U.S. at 622). This question embodies the recognition—set forth in *Heller*—"that the Second Amendment confers an individual right to keep and bear arms (though only arms that 'have some reasonable relationship to the preservation or efficiency of a well regulated militia')." *Heller*, 554 U.S. at 622.

Finally, we believe *Friedman* fits comfortably under the umbrella of *Ezell*. As outlined above, *Ezell* followed closely on the heels of *Heller* and *McDonald* at a time when "Second Amendment litigation [wa]s new." *Ezell*, 651 F.3d at 700. We endeavored therefore to set forth the "threshold" inquiries that would govern in "*some* Second Amendment cases." *Id*. at 701 (emphasis added). Specifically, we first ask whether the restricted activity is protected by the Second Amendment. If so, we inquire whether the strength of the government's reasons justifies the restriction of rights at issue, with the rigor of this second inquiry "depend[ing] on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id*. at 703. Shortly after *Ezell*, when the question of the constitutionality of assault-weapons bans arose in other circuits, those courts employed this approach to conclude that intermediate scrutiny should be applied and to uphold those bans under that level of scrutiny. *See Heller II*, 670 F.3d at 1252 ("adopt[ing], as have other circuits, a two-step approach to determining the constitutionality of the District's gun laws" and specifi-

cally citing *Ezell*); *Fyock*, 779 F.3d at 998. When *Friedman* came before us, we were able to draw upon the experience of those circuits in addressing, specifically, assault-weapons bans. Under those circumstances, we were able to pretermit discussion of more general principles concerning level of scrutiny and focus on the "concrete" inquiries that had informed those courts' analysis of whether the bans violated the Second Amendment. *Friedman*, 784 F.3d at 410. Thus, for instance, our inquiry "whether law-abiding citizens retain adequate means of self-defense," *id.*, finds a parallel in *Heller II*'s consideration of whether "the ban on certain semi-automatic rifles prevent[s] a person from keeping a suitable and commonly used weapon for protection in the home," 670 F.3d at 1262. Also like our sister circuits, in *Friedman* we evaluated the importance of the reasons for the Highland Park Ordinance to determine whether they justified the ban's intrusion on Second Amendment rights. We concluded, as our sister circuits had, that "reduc[ing] the overall dangerousness of crime" and making the public feel safer were "substantial" interests that justified the city's action in adopting the Highland Park Ordinance. *Friedman*, 784 F.3d at 412; *see also Fyock*, 779 F.3d at 1000–01 (noting that ban reasonably promoted the municipality's "substantial and important government interests" of "promoting public safety," "reducing violent crime," and "reducing the harm and lethality of gun injuries in general"). Our decision in *Friedman*, therefore, did not "shun[]" *Ezell*,[9] but merely represents the application and extension of its principles to the specific

---

[9] Appellants' Br. 29.

context of a ban on assault weapons and large-capacity magazines.

## Conclusion

As the Court did in *Heller*, it is important to note the limitations of our holding. We answer only the two questions presented by the appellants: should the district court have given the plaintiffs an opportunity to develop a factual record on which to distinguish *Friedman*, and should we revisit our holding in *Friedman*. Our answer to both questions is no. Our holding in *Friedman* did not depend upon the kinds of facts that the plaintiffs seek to gather, and the plaintiffs have come forward with no reason—much less a compelling one—for us to revisit *Friedman*. We do not establish here a comprehensive approach to Second Amendment challenges, and we leave for other cases further development and refinement of standards in this emerging area of the law.

For the foregoing reasons, the judgment of the district court dismissing the plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) is affirmed. The defendants may recover their costs in this court.

AFFIRMED