*168 Affirmed in part, vacated in part, and remanded by published opinion. Chief Judge TRAXLER wrote the opinion for the court as to Parts I, II, III, V, and VI, in which Judge AGEE joined. Judge AGEE wrote separately as to Part IV. Judge KING wrote an opinion dissenting as to Part III and concurring in the judgment as to Parts IV and V. Chief Judge TRAXLER wrote a dissenting opinion as to Part IV.
TRAXLER, Chief Judge,
wrote the opinion for the court as to Parts I, II, and III, in which Judge AGEE joined.
In April 2013, Maryland passed the Firearm Safety Act (“FSA”), which, among other things, bans law-abiding citizens, with the exception of retired law enforcement officers, from possessing the vast majority of semi-automatic rifles commonly kept by several million American citizens for defending their families and homes and other lawful purposes. Plaintiffs raise a number of challenges to the FSA, contending that the “assault weapons” ban trenches upon the core Second Amendment right to keep firearms in defense of hearth and home, that the FSA’s ban of certain larger-capacity detachable magazines (“LCMs”) likewise violates the Second Amendment, that the exception to the ban for retired officers violates the Equal Protection Clause, and that the FSA is void for vagueness to the extent that it prohibits possession of “copies” of the specifically identified semi-automatic rifles banned by the FSA. The district court rejected Plaintiffs’ Second Amendment challenges, concluding that the “assault weapons” and larger-capacity magazine bans passed constitutional muster under intermediate scrutiny review. The district court also denied Plaintiffs’ equal protection and vagueness claims.
In our view, Maryland law implicates the core protection of the Second Amendment — “the right of law-abiding responsible citizens to use arms in defense of hearth and home,” District of Columbia v. Heller, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and we are compelled by Heller and McDonald v. City of Chicago, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), as well as our own precedent in the wake of these decisions, to conclude that the burden is substantial and strict scrutiny is the applicable standard of review for Plaintiffs’ Second Amendment claim. Thus, the panel vacates the district court’s denial of Plaintiffs’ Second Amendment claims and remands for the district court to apply strict scrutiny. The panel affirms the district court’s denial of Plaintiffs’ Equal Protection challenge to the statutory exception allowing retired law enforcement officers to possess prohibited semi-automatic rifles. And, the panel affirms the district court’s conclusion that the term “copies” as used by the FSA is not unconstitutionally vague.
I. Background
A.
The FSA substantially expanded Maryland’s gun control laws. Prior to passage of the FSA, Maryland law permitted citizens in good standing to possess semiautomatic[1] rifles after passing an extensive background check.[2] The FSA made it *169 a crime after October 1, 2013, to “possess, sell, offer to sell, transfer, purchase, or receive” or to transport into Maryland any firearm designated as an “assault weapon.” Md.Code, Crim. Law § 4-303(a). Under the FSA, the term “assault weapon” includes “assault long gun[s],” “assault pistols],” and “copycat weapon[s].” Id. at § 4-301(d). Plaintiffs’ challenge in this appeal is limited to the ban on “assault long guns,” i.e., most semi-automatic rifles. An “assault long gun” is defined as any one of the more than 60 semi-automatic rifle or shotgun models specifically listed in section 5 — 101(r)(2) of the Maryland Public Safety Code, see Md.Code, Crim. Law § 4-301(b), “or their copies,” Md.Code, Pub. Safety § 5-101 (r)(2).[3] The FSA does not define the term “copies.” The list of prohibited weapons includes the semi-automatic rifle models most popular by far among American citizens, the AR-15 “and all imitations” and the semi-automatic AK-47 “in all forms.” Id. at § 5 — 101 (r)(2)(ii) and (xv).[4] Anyone who possesses a prohibited semiautomatic rifle or otherwise violates the FSA’s restrictions on such rifles “is guilty of a misdemeanor” and is subject to a prison term of up to three years. Md.Code, Crim. Law § 4-306(a).
The FSA also imposed new limits on the acquisition of detachable magazines in Maryland. Prior to the FSA, Maryland law permitted the acquisition and transfer of detachable magazines with a capacity of up to 20 rounds. See 2002 Maryland Laws Ch. 26, § 2. The FSA now makes it illegal to “manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.” Md.Code, Crim. Law § 4-305(b).[5] The FSA, however, does not expressly prohibit *170 the transportation of magazines holding more than 10 rounds into Maryland from out of state, as it does the transportation of semi-automatic rifles. The same penalties that apply to a violation of the statutory prohibitions against semi-automatic rifles apply to a violation of the provisions regulating magazines holding more than 10 rounds. See Md.Code, Crim. Law § 4-306(a).
The FSA provides a few exceptions to the ban on possessing semi-automatic rifles or LCMs. For example, the statute contains a grandfather clause pursuant to which “[a] person who lawfully possessed” or “completed an application to purchase” a prohibited semi-automatic rifle “before October 1, 2013” may lawfully continue to “possess and transport” it. See Md.Code, Crim. Law § 4 — 303(b)(3)(i). And the FSA’s prohibitions do not apply to several classes of individuals, such as active law enforcement officers and licensed firearms dealers under certain circumstances. See Md.Code, Crim. Law §§ 4-302(1), (3). Another exception allows retired state or local law enforcement agents to possess banned weapons and LCMs if the weapon or magazine was “sold or transferred to the [retired agent] by the law enforcement agency on retirement,” or the retired agent “purchased or obtained” the weapon “for official use with the law enforcement agency before retirement.” See Md.Code, Crim. Law §§ 4-302(7)(i), (ii).
B.
Plaintiff Stephen Kolbe is a life-long resident of Maryland who resides in Towson and owns a small business in Baltimore County. Kolbe owns “one full-size semiautomatic handgun” that is equipped with a standard detachable magazine that holds more than 10 rounds. J.A. 1851. Various personal experiences, including an incident in which an employee’s ex-boyfriend threatened to come kill her at work but police did not respond for thirty minutes, and Kolbe’s family’s close proximity to “a high-traffic public highway,” J.A. 1852, have caused Kolbe to conclude that he needs to keep firearms for the purpose of “self-defense in [his] home.” J.A. 1851. But for the ban imposed by the FSA, Kolbe would purchase a semi-automatic rifle, which “possesses] features which make[s] [it] ideal for self-defense in the home.” J.A. 1851.
Plaintiff Andrew Turner is a Maryland resident who currently owns three semiautomatic rifles, now banned as assault weapons under the FSA, and a semi-automatic handgun, all of which come with standard detachable magazines holding more than 10 rounds. While on active duty in the United States Navy, Turner suffered an injury that makes it difficult for him to operate firearms and thus necessitates “access to full-capacity magazines ... to ensure,” among other things, his ability to defend himself in his home. J.A. 1856. According to Turner, he would purchase additional semi-automatic rifles with detachable LCMs if Maryland law did not prohibit him from doing so. Turner’s primary purpose for owning such firearms is self-defense in his home, but he also uses his currently owned semiautomatic rifles for target shooting and hunting.
Finally, Wink’s Sporting Goods, Inc., and Atlantic Guns, Inc. — two businesses that operate in the firearms, hunting, and sport shooting industries — joined the individual plaintiffs in challenging the FSA. Likewise, several trade, hunting and gun-owners’ rights organizations joined as plaintiffs on their own behalf and on behalf of their members.[6]
*171 Just before the FSA took effect on October ,1, 2013, Plaintiffs filed a Motion for a Temporary Restraining Order and sought declaratory and injunctive relief, arguing that the ban on possession of assault rifles and the 10-round limitation on detachable magazines abridges their rights under the Second Amendment; that the exemption for retired law enforcement officers under the FSA violates the Equal Protection Clause of the Fourteenth Amendment; and that the term “copies” as it is used in section 5 — 101(r)(2) of Maryland’s Public Safety Code is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.
After the district court denied Plaintiffs’ Motion for a Temporary Restraining Order, the parties filed cross motions for summary judgment on the merits. The district court determined that intermediate scrutiny applied to the Second Amendment claims. In granting summary judgment to the State, the district court concluded, under intermediate scrutiny, that Maryland’s ban on “assault” rifles and LCMs met the applicable standards and was thus valid under the Second Amendment. See Kolbe v. O’Malley, 42 F.Supp.3d 768, 797 (D.Md.2014). The district court also granted summary judgment for the State on Plaintiffs’ Equal Protection claim to the statutory exception for retired law enforcement officers, holding that retired officers “are differently situated” than ordinary citizens who wish to obtain assault rifles. Id. at 798. Finally, the district court granted summary judgment for the State on Plaintiffs’ vagueness claim based on its conclusion that the ban on possessing assault rifles “or their copies” sets forth “an identifiable core of prohibited conduct.” Id. at 802. '
Plaintiffs appeal.
II. Standard of Review
As we noted above, the district court decided this case on cross-motions for summary judgment. “When faced with crossmotions for summary judgment, we consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.” Bacon v. City of Richmond, 475 F.3d 633, 637-38 (4th Cir.2007) (internal quotation marks omitted). In doing so, we apply the ordinary de novo standard, while “resolving all doubts and inferences in favor of the non-moving party.” Id.
Plaintiffs challenge each of the district court’s rulings. We address these challenges seriatim.
III. Second Amendment
We turn first to Plaintiffs’ Second Amendment challenge to the FSA’s ban on semi-automatic rifles and LCMs. The Second Amendment, of course, provides that “[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” In United States v. Chester, we fashioned a two-part approach to resolving Second Amendment challenges, see 628 F.3d 673, 680 (4th Cir. 2010), much like the approach adopted by several of our sister circuits in the wake of Heller, see, e.g., Fyock v. Sunnyvale, 779 F.3d 991, 996 (9th Cir.2015); Ezell v. City of Chicago, 651 F.3d 684, 701-03 (7th Cir.2011); Heller v. District of Columbia (“Heller II”), 670 F.3d 1244, 1252 (D.C.Cir.2011); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir.2010); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir.2010). First, we ask “whether the challenged law imposes a burden on conduct *172 falling within the scope of the Second Amendment’s guarantee.” Chester, 628 F.3d at 680 (internal quotation marks omitted). The answer to this question requires an “historical inquiry” into “whether the conduct at issue was understood to be within the scope of the right at the time of ratification.” Id.; see Heller, 554 U.S. at 626-27, 128 S.Ct. 2783. If the answer to this initial inquiry is no, “the challenged law is valid.” Chester, 628 F.3d at 680. Éowever, “[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny.” Id.
A. Does the FSA’s Ban Implicate Second Amendment Rights?
We first address the threshold question of whether the bans imposed by the FSA burden conduct that falls within the scope of the Second Amendment. As is now well understood, Heller affirmed that the Second Amendment protects a preexisting “individual right to possess and carry weapons in case of confrontation.” 554 U.S. at 592, 128 S.Ct. 2783. “[D]eeply rooted in this Nation’s history and tradi-. tion,” McDonald, 561 U.S. at 768,130 S.Ct. 3020 (internal quotation marks omitted), this right is among the “fundamental rights necessary to our system of ordered liberty,” id. at 778, 130 S.Ct. 3020. The right to keep and bear arms historically has been understood to encompass “self-defense and hunting,” Heller, 554 U.S. at 599, 128 S.Ct. 2783, but Heller made clear “the central component of the Second Amendment right” is “individual self-defense,” McDonald, 561 U.S. at 767, 130 S.Ct. 3020. Moreover, the right to keep arms is at its greatest strength in “the home, where the need for defense of self, family, and property is most acute.” Heller, 554 U.S. at 628,128 S.Ct. 2783.
The FSA makes it unlawful for any citizen “to possess, ... purchase, or receive” an “assault weapon.” Md.Code, Crim. Law § 4-303(a).[7] The statute prohibits all forms of possession of any weapon listed in section 5-101(r)(2)-a law-abiding citizen cannot keep any of these weapons in the home for any reason, including the defense of self and family. Accordingly, the conduct being regulated by the FSA includes an individual’s possession of a firearm in the home for self-defense.
The Supreme Court has already performed an historical analysis of our traditional understanding of a citizen’s right to keep a weapon at home for self-defense, concluding that “the right of law-abiding, responsible citizens to use arms in defense of hearth and home” lies at the core of the Second Amendment. Heller, 554 U.S. at 635, 128 S.Ct. 2783. Any prohibition or restriction imposed by the government on the exercise of this right in the home clearly implicates conduct protected by the Second Amendment.
The right to keep and bear arms, as a matter of history and tradition, “is not unlimited,” of course, as even law-abiding citizens do not have “a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” Id. at 626, 128 S.Ct. 2783. Of particular relevance to this appeal is the historical limitation upon which arms a citizen had the right to bear, as the Second Amendment protects only “the sorts of weapons ... in common use at the time.” Id. at 627, 128 S.Ct. 2783 (emphasis added) *173 (internal quotation marks omitted). “[The Second Amendment] does not extend to all types of weapons, only to those typically possessed by law-abiding citizens for lawful purposes.” Marzzarella, 614 F.3d at 90. This limitation reflects “the historical tradition of prohibiting the carrying of dangerous and unusual weapons.” Id. (internal quotation marks omitted; emphasis added).
Moreover, when the regulated conduct relates to a particular class of weapong, we must address an additional issue before we can say with assurance that the Second Amendment applies and turn to the question of the appropriate level of scrutiny. That is, we must determine whether the particular class of weapons prohibited or regulated by the statute are themselves protected by the Second Amendment. See Friedman v. City of Highland Park, 784 F.3d 406, 414 (7th Cir.2015) (Manion, J., dissenting) (“[W]here, as here, the activity is directly tied to specific classes of weapons, we are faced with an additional threshold matter: whether the classes of weapons regulated are commonly used by law-abiding citizens. If the weapons in question (assault rifles and high-capacity magazines) are not commonly used by law-abiding citizens, then our inquiry ends as there is no Second Amendment protection.... ”).
In United States v. Miller, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), the Court rejected a Second Amendment challenge to the defendants’ convictions for unlawful possession of a short-barreled shotgun because there was no “evidence tending to show” that such a weapon was related “to the preservation or efficiency of a well regulated militia” or was “part of the ordinary military equipment,” id. at 178, 59 S.Ct. 816. Significantly, however, Miller noted that “ordinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.” Id. at 179, 59 S.Ct. 816; see Heller, 554 U.S. at 624-25, 128 S.Ct. 2783 (“The traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes like self-defense. In the colonial and revolutionary war era, small-arms weapons used by militiamen and weapons used in defense of person and home were one and the same.” (internal quotation marks and alteration omitted)). Reading Miller’s passages together, the Heller Court clarified Miller’s holding and explained that “the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.” Heller, 554 U.S. at 625, 128 S.Ct. 2783 (emphasis added). Accordingly, the Second Amendment extends only to those weapons “typically possessed by law-abiding citizens for lawful purposes,” id.; see Marzzarella, 614 F.3d at 90 (“[The Second Amendment extends] ... only to those [weapons] typically possessed by law-abiding citizens for lawful purposes.”); Heller II, 670 F.3d at 1260 (“[W]e must also ask whether the prohibited weapons are typically possessed by law-abiding citizens for láwful purposes; if not, then they are not the sorts of Arms protected by the Second Amendment.” (internal citation and quotation marks omitted)); United States v. Fincher, 538 F.3d 868, 873 (8th Cir.2008) (explaining there is no protection for “weapons not typically possesséd by law-abiding citizens for lawful purposes” (internal quotation marks omitted)). Thus, we must determine whether semi-automatic rifles and LCMs are commonly possessed by law-abiding citizens for lawful purposes. See Fyock, 779 F.3d at 998; Heller II, 670 F.3d at 1260-61.

*174
Commonly Possessed

Like a number of courts that have previously considered this question, we have little difficulty in concluding that the banned semi-automatic rifles are in common use by law-abiding citizens. See, e.g., Heller II, 670 F.3d at 1261 (“We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in ‘common use,’ as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.”); Colorado Outfitters Ass’n v. Hickenlooper, 24 F.Supp.3d 1050, 1068 (D.Colo.2014) (concluding that statute “affects the use of firearms that are both widespread and commonly used for self-defense,” in view of the fact that “lawfully owned semi-automatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions”); Shew v. Malloy, 994 F.Supp.2d 234, 246 (D.Conn.2014) (concluding that semi-automatic rifles such as the AR-15 as well as magazines with a capacity greater than 10 rounds “are ‘in common use’ within the meaning of Heller and, presumably, used for lawful purposes”). We make the assessment based on the present-day use of these firearms nationwide. See, e.g., Heller II, 670 F.3d at 1261 (looking to present-day use to assess common use); United States v. Tagg, 572 F.3d 1320, 1326 (11th Cir.2009) (same); United States v. Fincher, 538 F.3d 868, 874 (8th Cir.2008) (same).
We think it is beyond dispute from the record before us, which contains much of the same evidence cited in the aforementioned decisions, that law-abiding citizens commonly possess semi-automatic rifles such as the AR-15. Between 1990 and 2012, more than 8 million AR- and AK-platform semi-automatic rifles alone were manufactured in or imported into the United States. J.A. 1877. In 2012, semi-automatic sporting rifles accounted for twenty percent of all retail firearms sales. J.A. 1880. For perspective, we note that in 2012, the number of AR- and AK-style weapons manufactured and imported into the United States was more than double the number of Ford F-150 trucks sold, the most commonly sold vehicle in the United States. J.A. 1878.
Likewise, the record in this case shows unequivocally that LCMs are commonly kept by American citizens, as there are more than 75 million such magazines in circulation in the United States. In fact, these magazines are so common that they are standard. “[0]n a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.” J.A. 2122. Even more than 20 years ago, “fully 18 percent of all firearms owned by civilians ... were equipped with magazines holding more than ten rounds.” Heller II, 670 F.3d at 1261. Virtually every federal court to have addressed this question has concluded that “magazines having a capacity to accept more than ten rounds are in common use.” Fyock v. City of Sunnyvale, 25 F.Supp.3d 1267, 1275 (ND.Cal.2014) (noting such magazines comprise “approximately 47 percent of all magazines owned” and number “in the tens-of-millions, even under the most conservative estimates” (internal quotation marks omitted)), aff'd, 779 F.3d 991, 998 (9th Cir.2015) (“[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, magazines are in common use.”). “There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that *175 capacity surely is not ten.” Heller II, 670 F.3d at 1261; see also Shew, 994 F.Supp.2d at 245-46; New York State Rifle & Pistol Ass’n, Inc. v. Cuomo, 990 F.Supp.2d 349, 365 (W.D.N.Y.2013).
In addition, we reject the State’s argument that the Second Amendment does not apply to detachable magazines because magazines are not firearms — that is, detachable magazines do not constitute “bearable” arms that are expressly protected by the Second Amendment. See U.S. Const.amend. II. By Maryland’s logic, the government can circumvent Heller, which established that the State cannot ban handguns kept in the home for self-defense, simply by prohibiting possession of individual components of a handgun, such as the firing pin. But of course, without the ability to actually fire a gun, citizens cannot effectively exercise the right to bear arms. See Jackson v. City of San Francisco, 746 F.3d 953, 967 (9th Cir.2014) (“The Second Amendment protects ‘arms,’ ‘weapons,’ and ‘firearms’; it does not explicitly protect ammunition. Nevertheless, without bullets, the right to bear arms would be meaningless.”). In our view, “the right to possess firearms for protection implies a corresponding right” to possess component parts necessary to make the firearms operable. Id. (internal quotation marks omitted); see Ezell, 651 F.3d at 704 (“The right to possess firearms for protection implies a corresponding right to ... maintain proficiency in their use; the core right wouldn’t mean much without the training and practice that make it effective.”).
This reasoning applies to the magazines in question. To the extent that firearms equipped with detachable magazines are commonly possessed by law-abiding citizens for lawful purposes, there must also be an ancillary right to possess the magazines necessary to render those firearms operable. To the extent the State can regulate these magazines, it is not because the magazines are not bearable “arms” within the meaning of the Second Amendment.
Our conclusion that these magazines constitute “arms” also finds strong historical support. Heller looked to early definitions of “arms” to determine what weapons implicated the Second Amendment, and those definitions were broad, including “weapons of offence, or armour of de-fence,” or anything “that a man ... takes into his hands, or useth in wrath to cast at or strike another.” Heller, 554 U.S. at 581, 128 S.Ct. 2783. Other dictionaries of the time say the same. See, e.g., Nathan Bailey, An Universal Etymological English Dictionary 47 (1756) (defining “arm” as “to furnish with armour of defense, or weapons of offence”). Obviously, magazines and the rounds they contain are used to strike at another and inflict damage. Early American provisions protecting the right to “arms” were also crafted partly in response to British measures that, while not taking away guns entirely, drastically impaired their utility — suggesting “arms” should be read to protect all those items necessary to use the weapons effectively. See Saul Cornell, The Early American Origins of the Modem Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History, 17 Stan. L. & Pol’y Rev. 571, 577 (2006) (describing British efforts to steal colonial Williamsburg’s store of gunpowder, thereby rendering the firearms of citizens useless). In short, magazines and other forms of ammunition have long been recognized as arms.

Lawful Purposes

Plaintiffs Kolbe and Turner both seek to acquire and keep semi-automatic rifles, equipped with LCMs, in their homes pri *176 marily for self-defense. And, they proffered evidence suggesting that they are not alone in this regard. For' example, Plaintiffs’ expert James Curcuruto presented survey evidence showing that self-defense was a primary reason for the purchase. of weapons banned under the FSA, and a 1989 Report from the Bureau of Alcohol, Tobacco, and Firearms indicated that self-defense was a suitable purpose for semi-automatic rifles. The State’s expert Daniel Webster even agreed that it is reasonable to assume that a purpose for keeping one of the prohibited weapons is self-defense in the home.
The State argues that even if ownership of the prohibited weapons and magazines is common, nothing in the record reflects that these weapons are commonly used for self-defense. More specifically, the State’s position is premised on Plaintiffs’ lack of evidence that the banned semi-automatic rifles have ever actually been used in self-defense in Maryland, as opposed to being possessed for self-defense.
The State’s position flows from a hyper-technical, out-of-context parsing of the Supreme Court’s statement in Heller “that the sorts of weapons protected were those in common use at the time.” Heller, 554 U.S. at 627, 128 S.Ct. 2783 (emphasis added; internal quotation marks omitted). The State misreads Heller, as Second Amendment rights do not depend on how often the semi-automatic rifles or regulated magazines are actually used to repel an intruder. The proper standard under Heller is whether the prohibited weapons and magazines are “typically possessed by law-abiding citizens for lawful purposes” as a matter of history and tradition, id. at 625, 128 S.Ct. 2783 (emphasis added), not whether the magazines are often actually employed in self-defense incidents. Actual use in self-defense is a poor measure of whether a particular firearm is “typically possessed by law-abiding citizens” for self-defense, as it is unlikely most people will ever need to actually discharge a firearm in self-defense. See Fyock, 25 F.Supp.3d at 1276 (“The fact that few people will require a particular firearm to effectively defend themselves should be celebrated and not seen as a reason to except [that firearm] from Second Amendment protection. Evidence that such magazines are typically possessed by law-abiding citizens for lawful purposes is enough.”).
More importantly, it is the government’s burden to establish that a particular weapon or activity falls outside the scope of the Second Amendment right. See Ezell, 651 F.3d at 702-03 (“[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment-1791 or 1868-then the analysis can stop there.”). So far as we can tell, nothing in the record suggests any such tradition with respect to semi-automatic rifles or LCMs. In fact, the Supreme Court, in a pre-Heller decision, hinted at the opposite, stating that “certain categories of guns,” such as “machineguns, sawed-off shotguns, and artillery pieces,” have a “quasi-suspect character,” but that “guns falling outside those categories traditionally have been widely accepted as lawful possessions.” Staples v. United States, 511 U.S. 600, 611-12, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Heller reiterated that “the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.” 554 U.S. at 625, 128 S.Ct. 2783 (emphasis added).
We find nothing in the record demonstrating that law-abiding citizens have been historically prohibited from possessing semi-automatic rifles and LCMs. See *177 Friedman, 784 F.3d at 418 (Manion, J., dissenting) (“[0]utside of weapons deemed dangerous or unusual, there is no historical tradition supporting wholesale prohibitions of entire classes of weapons.”). In fact, semi-automatic firearms have been in use by the civilian population for more than a century. “[Ijnitially called ‘self-loading’ or ‘auto-loading’ firearms,” J.A. 2254, semi-automatic weapons with detachable magazines started to see significant advancements in the late 1800s. In 1893, the “Brochardt semi-auto pistol” was developed for the civilian market. J.A. 2255. In 1905, Winchester produced a semi-automatic rifle, equipped with either a five-or ten-round detachable magazine. And, in 1963,_ Colt produced the SP-1 semiautomatic rifle with a 20-round detachable magazine, later known as the AR-15, a semi-automatic counterpart to the fully automatic M-16. There is no record evidence or historical documentation that these weapons were at all prohibited until relatively recently.

Dangerous and Unusual Weapons

Finally, the State argues that the banned semi-automatic rifles are “unusually dangerous” and therefore do not fall within the ambit of the Second Amendment. Heller makes clear that “dangerous and unusual” weapons are not “weapons typically possessed by law-abiding citizens for lawful purposes” that have some degree of Second Amendment protection. But because all firearms are dangerous by definition, the State reasons that Heller must mean firearms that are “unusually dangerous” fall altogether outside of the scope of the Second Amendment. The State views the banned guns and LCMs as “unusually dangerous,” rendering the Second Amendment inapplicable to the ban.
The State’s novel “unusually dangerous” standard reads too much into Heller. As best we can tell, no statute or case has mentioned, much less adopted, the State’s newly proffered standard.
In distinguishing between protected and unprotected weapons, Heller focused on whether the weapons were typically or commonly possessed, not whether they reached or exceeded some undefined level of dangerousness. Hand grenades, sawed-off shotguns and fully automatic “M-16 rifles and the like,” Heller, 554 U.S. at 627, 128 S.Ct. 2783, are unusual weapons that fall outside of the Second Amendment because they are not in common use or typically possessed by the citizenry, see id.; Fincher, 538 F.3d at 874 (“Machine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use.”).
Nothing in Heller suggests that courts considering a Second Amendment challenge must decide whether a weapon is “unusually dangerous.” Moreover, the difficulties that would arise from the application of such a standard are fairly apparent. How is a court to determine which weapons are too dangerous to implicate the Second Amendment? The district court believed that semi-automatic rifles with LCMs are too dangerous based on evidence that they unleash greater destructive force than other firearms and appear to be disproportionately connected to mass shootings. But if the proper judicial standard is to go by total murders committed, then handguns should be considered far more dangerous than semi-automatic rifles. “[M]ost murders in America are committed with handguns. No other weapon is used nearly as often. During 2006, handguns were used in 60% of all murders while long guns ... were used only in 7%.” Carl T. Bogus, Gun Control & America’s Cities: Public Policy & Poli *178 tics, lAlb. Gov’t L.Rev. 440, 447 (2008) (footnote omitted). And, the use of handguns in the number of overall homicides is out of proportion to the ownership of handguns. See id. at 447 (“[A]mong the 192 million guns in America only 35% are handguns ... [H]andguns are used in 88% of all firearm murders.” (footnote omitted)). Yet Heller has established that handguns are constitutionally protected and therefore cannot be too dangerous for Second Amendment purposes.
Furthermore, Heller refers to “dangerous” and “unusual” conjunctively, suggesting that even a dangerous weapon may enjoy constitutional protection if it is widely employed for lawful purposes, i.e., not unusual. Founding era understandings of what it means for something to be “unusual” reflect that the firearm must be rare to be considered “unusual.” See Samuel Johnson, A Dictionary of the English Language 717 (1768) (defining “unusual” as “not common: not frequent: rare”); Bailey, swpra, at 641 (defining “unusualness” as “rareness, and uncommonness”); accord Peruta v. Cnty. of San Diego, 742 F.3d 1144, 1154 (9th Cir.2014) (suggesting that laws applicable to “dangerous and unusual” weapons were “understood to cover carriage of uncommon, frightening weapons only”). Scholars often read “unusual” in the same way. See, e.g., Jordan Pratt, Uncommon Firearms as Obscenity, 81 Tenn. L.Rev. 633, 637 (2014) (equating “dangerous and unusual” firearms with “uncommon” ones”); Dan Terzian, The Right to Bear (Robotic) Arms, 117 Penn St. L.Rev. 755, 767 (2013) (“Most likely, common use is the sole limiting principle.”). If the firearm in question is commonly possessed for lawful purposes, it certainly isn’t “rare” and thereby “unusual.” See, e.g., Fyock, 25 F.Supp.3d at 1275 (“To measure whether a weapon is dangerous and unusual, the court looks at whether it is in common use....”); In re Wheeler, 433 N.J.Super. 560, 81 A.3d 728, 750 (App.Div.2013) (“[T]he protection was not understood to extend to the keeping, carrying or using of weapons that were deemed dangerous or unusual, in the sense that they were not typically used by the law-abiding and responsible for lawful purposes.”). Indeed, it was only a dissent in Heller that focused on dangerousness alone. See Heller, 554 U.S. at 711, 128 S.Ct. 2783 (Breyer, J., dissenting). Thus, the State’s “unusually dangerous” argument is of no avail. Our good colleague in dissent would not reach this issue and therefore assumes for analytical purposes that semi-automatic rifles like the AR-15 are not “dangerous and unusual” but are commonly possessed by law-abiding citizens for lawful purposes.[8]
In sum, semi-automatic rifles and LCMs are commonly used for lawful purposes, and therefore come within the coverage of the Second Amendment.[9]
*179 B. Appropriate Level of Scrutiny
Having determined that the Second Amendment covers the prohibited semi-automatic rifles, we next consider whether the district court erred in applying intermediate scrutiny.
We first consider which of the two relevant standards of scrutiny (strict or intermediate scrutiny) should apply.[10] The strict-serutiny standard requires the government to prove its restriction is “narrowly tailored to achieve a compelling governmental interest.” Abrams v. Johnson, 521 U.S. 74, 82, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); see Citizens United v. Federal Election Comm’n, 558 U.S. 310, 340, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (explaining strict scrutiny “requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest” (internal quotation marks omitted)). To be narrowly tailored, the law must employ the least restrictive means to achieve the compelling government interest. See United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). Conversely, intermediate scrutiny requires the government to “demonstrate ... that there is a reasonable fit between the challenged regulation and a substantial government objective.” Chester, 628 F.3d at 683. For several reasons, we find that the Act’s firearms and magazine bans require strict scrutiny.
 In Chester, we adopted a First-Amendment-like approach to determining the appropriate level of scrutiny to apply to any given Second Amendment challenge. To select the proper level of scrutiny, we consider “the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” 628 F.3d at 682. “A less severe regulation — a regulation that does not encroach on the core of the Second Amendment— requires a less demanding means-ends showing.” Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco & Firearms, 700 F.3d 185, 195 (5th Cir.2012); see also United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir.2012) (“The right to bear arms, however venerable, is qualified by what one might call the ‘who,’ ‘what,’ Vhere,’ “when,’ and ‘why.’ ”).
First, the FSA’s ban on semi-automatic rifles and larger-capacity magazines burdens the availability and use of a class of arms for self-defense in the home, where the protection afforded by the Second Amendment is at its greatest. It implicates the “core” of the Second Amendment: “the right of law-abiding, responsible citizens to use arms in defense of *180 hearth and home.” Heller, 554 U.S. at 634, 635, 128 S.Ct. 2783; see Kachalsky v. County of Westchester, 701 F.3d 81, 89 (2d Cir.2012) (“What we know from [Heller and McDonald] is that Second Amendment guarantees are at their zenith within the home”). At stake here is a “basic right,” McDonald, 561 U.S. at 767, 130 S.Ct. 3020, “that the Framers and ratrfiers of the Fourteenth Amendment counted ... among those fundamental rights necessary to our system of ordered liberty,” id. at 778, 130 S.Ct. 3020. Indeed, “[t]he [Supreme] Court [in Heller] went to great lengths to emphasize the special place that the home-an individual’s private property-occupies in our society.” GeorgiaCar-ry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir.2012).
Second, we conclude that the challenged provisions of the FSA substantially burden this fundamental right. The burden imposed in this case is not merely incidental. Maryland law imposes a complete ban on the possession by law-abiding citizens of AR-15 style rifles-the most popular class of centerfire semi-automatic rifles in the United States. As we explained in Section III.A., these weapons are protected under the Second Amendment. We therefore struggle to see how Maryland’s law would not substantially burden the core Second Amendment right to defend oneself and one’s family in the home with a flrearm that is commonly possessed by law-abiding citizens for such lawful purposes. Moreover, the FSA also reaches every instance where an AR-15 platform semi-automatic rifle or LCM might be preferable to handguns or bolt-action rifles-for example hunting, recreational shooting, or competitive marksmanship events, all of which are lawful purposes protected by the Constitution. See Friedman v. City of Highland Park, — U.S. —, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015) (Thomas, J., dissenting from the denial of cert.) (“[T]he ordinance criminalizes modern sporting rifles (e.g., AR-style semiautomatic rifles), which many Americans own for lawful purposes like self-defense, hunting, and target shooting.”). Thus, the FSA completely prohibits, not just regulates, an entire category of weaponry.[11] As Judge Kavanaugh noted in dissent in Heller II, prohibiting this group of weapons might be “equivalent to a ban on a category of speech.” 670 F.3d at 1285.
Contrary to the district court’s conclusion, the fact that handguns, bolt-action and other manually-loaded long guns, and, as noted earlier, a few semi-automatic rifles are still available for self-defense does not mitigate this burden. See, e.g., Jackson v. City & Cnty. of San Fran., — U.S. —, 135 S.Ct. 2799, 2801, 192 L.Ed.2d 865 (2015) (Thomas, J., dissenting from the *181 denial of certiorari) (“[N]othing in our decision in Heller suggested that a law must rise to the level of the absolute prohibition at issue in that case to constitute a ‘substantial burden’ on the core of the Second Amendment right.”). Indeed, the Supreme Court rejected essentially the same argument in Heller — that the District of Columbia’s handgun ban did not unconstitutionally burden the right to self-defense because the law permitted the possession of long guns for home defense. See Heller, 554 U.S. at 629, 128 S.Ct. 2783 (“It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.”); accord Parker v. District of Columbia, 478 F.3d 370, 400 (D.C.Cir.2007) (rejecting the District’s argument that alternative weapons rendered handgun ban lawful, calling it “frivolous,” and noting that “[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted”); cf. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 556, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (“[0]ne is not to have the exercise of liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.”). A semi-automatic rifle may not be “the quintessential self-defense weapon,” as Heller described the handgun, 554 U.S. at 629, 128 S.Ct. 2783; nonetheless, as we explained previously, AR-15s and the like are commonly possessed by law-abiding citizens for self-defense and other lawful purposes and are protected under the Second Amendment.
There are legitimate reasons for citizens to favor a semiautomatic rifle over handguns in defending themselves and their families at home. The record contains evidence suggesting that “handguns are inherently less accurate than long guns” as they “are more difficult to steady” and “absorb less of the recoil ..., reducing accuracy.” J.A. 2131. This might be an important consideration for a typical homeowner, who “under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target.” J.A. 2123. “Nervousness and anxiety, lighting conditions, the presence of physical obstacles ... and the mechanics of retreat are all factors which contribute to [the] likelihood” that the homeowner will shoot at but miss a home invader. J.A. 2123. These factors could also affect an individual’s ability to reload a firearm quickly during a home invasion. Similarly, a citizen’s ability to defend himself and his home is enhanced with an LCM.
In sum, for a law-abiding citizen who, for whatever reason, chooses to protect his home with a semi-automatic rifle instead of a semi-automatic handgun, or possesses an LCM for use in firearms kept in the home, the FSA significantly burdens the exercise of the right to arm oneself at home. “The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself.” Friedman, 784 F.3d at 418 (Manion, J., dissenting); see id. at 413 (“[T]he ultimate decision for what constitutes the most effective means of defending one’s home, family, and property resides in individual citizens and not the government.... The extent of danger— real or imagined — that a citizen faces at home is a matter only that person can assess in full.”). The FSA “restrict[s] the right[] of [Maryland’s] citizens to select the means by which they defend their homes and families.” Id. at 419.
As we have noted on previous occasions, “any law that would burden the ‘fundamental,’ core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny. But, as we move outside the home, firearm rights *182 have always been more limited.” United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir.2011). “[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable,” id., with strict scrutiny applying to laws restricting the right to self-defense in the home, see Woollard v. Gallagher, 712 F.3d 865, 878 (4th Cir.2013) (observing that restrictions on “the right to arm oneself at home” necessitates the application of strict scrutiny). Strict scrutiny, then, is the appropriate level of scrutiny to apply to the ban of semiautomatic rifles and magazines holding more than 10 rounds. See Friedman, 784 F.3d at 418 (Manion, J., dissenting); cf. Heller II, 670 F.3d at 1284 (Kavanaugh, J., dissenting) (reading Heller as departing from traditional scrutiny standards but stating that “[e]ven if it were appropriate to apply one of the levels of scrutiny after Heller, surely it would be strict scrutiny rather than ... intermediate scrutiny”).
We recognize that other courts have reached different outcomes when assessing similar bans, but we ultimately find those decisions unconvincing.
The Seventh Circuit, for instance, recently upheld a ban on “assault weapons” and LCMs by dispensing with levels of scrutiny entirely. See Friedman, 784 F.3d at 410. Instead, that court conjured its own test, asking “whether a regulation bans weapons that were common at the time of ratification or those that have some reasonable relationship to the preservation or efficiency of a well regulated militia, and whether law-abiding citizens retain adequate means of self-defense.” Id. (internal quotation marks and citations omitted). The Seventh Circuit’s approach cannot be reconciled with Heller, which looked to present-day use to assess whether handguns are in common use (and consequently protected). See 554 U.S. at 629, 128 S.Ct. 2783; see also id. at 582, 128 S.Ct. 2783 (“Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.” (emphasis added)). Friedman, on the other hand, ignores the Supreme Court’s specification of present-day focus and asks instead whether certain features of the weapons in question were common at the time of the Founding, effectively elevating a Heller dissent to constitutional canon. Compare Friedman, 784 F.3d at 408-09 (suggesting that present day common use cannot be the relevant test because machine guns were in common use when they were federally banned in 1934 and are now uncommon because of the ban), with Heller, 554 U.S. at 720-21, 128 S.Ct. 2783 (Breyer, J., dissenting) (same).
Friedman’s problems stretch beyond its direct contradiction of Heller. For instance, the Friedman opinion defines the scope of the Second Amendment right by reference to militias — but it then declares that states, “which are in charge of militias,” should determine what weapons are rightfully held for militia — related purposes. Friedman, 784 F.3d at 410-11. That course effectively permits states to opt-out of the Second Amendment. But see McDonald, 561 U.S. at 750, 130 S.Ct. 3020 (“[T]he Second Amendment right is fully applicable to states.”). Friedman also concludes that the “dangerousness” of the regulated weapons should not be decisive, Friedman, 784 F.3d at 409, but nevertheless dismisses the self-defense-related benefits of those same weapons because they “can fire more shots, faster, and thus can be more dangerous in aggregate,” id. at 411. And it recognizes that the restriction must be supported by some genuine state interest, but then finds such an interest in the fact that bans might “reduce[] the perceived risk from a mass shooting.” Id. at 412 (emphasis added). In other words, *183 under the Seventh Circuit’s view, a significant restriction on a fundamental right might be justified by benefits that are quite literally imagined into existence. Needless to say, we see much to question in the Seventh Circuit’s decision.
Two courts of appeal have applied the standard of intermediate scrutiny to restrictions like Maryland’s. See Fyock, 779 F.3d at 999 (applying intermediate scrutiny to an LCM ban); Heller II, 670 F.3d at 1262 (applying intermediate scrutiny to a semi-automatic weapon and LCM ban). Both did so after rather conclusorily determining that the bans in those cases did not impose any significant burden on the Second Amendment right. For its part, the D.C. Circuit was “reasonably certain” that the challenged laws didn’t impose a substantial burden, Heller II, 670 F.3d at 1262, while the Ninth Circuit found that the district court did not “abuse [its] discretion” at the preliminary injunction stage in finding much the same, Fyock, 779 F.3d at 999.
For example, the D.C. Circuit in Heller II, with de minimis analysis, simply concluded that prohibitions of the arms in question would meet intermediate scrutiny because “the ban on certain semi-automatic rifles [does not] prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting[.]” 670 F.3d at 1262. As noted earlier, this genre of judicial conclusion seems plainly contrary to the Supreme Court’s logic and statements in Heller: “It is no answer to say ... that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.” 554 U.S. at 629, 128 S.Ct. 2783. Notwithstanding this guidance from the Supreme Court, the Heller II court went on to also summarily conclude that “the prohibition of semi-automatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves.” 670 F.3d at 1262. This holding seems to directly contradict the Supreme Court’s statement in Heller that the Second Amendment “surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” 554 U.S. at 635, 128 S.Ct. 2783. Thus, we find Heller II and Fyock without persuasive reasoning and simply incorrect.
Whatever may be said about the bans at issue in Fyock and Heller II, it should be obvious by this point that we view Maryland’s ban quite differently. A wholesale ban on an entire class of common firearms is much closer to the total handgun ban at issue in Heller than more incidental restrictions that might be properly subject to intermediate scrutiny. The law here “goes beyond mere regulation” and is instead “a total prohibition of possession of certain types of arms.” Arnold v. Cleveland, 67 Ohio St.3d 35, 616 N.E.2d 163, 176 (1993) (Hoffman, J., concurring in part and dissenting in part) (addressing assault-weapons ban); see also Marzzarella, 614 F.3d at 97 (stressing that the ban in Heller was subject to most scrutiny because “[i]t did not just regulate possession of handguns; it prohibited it”). In this way, Maryland’s outright ban on LCMs and “assault weapons” is akin to a law that “foreclose^] an entire medium of expression.” City of Ladue v. Gilleo, 512 U.S. 43, 55, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). Such laws receive exceptionally rigorous review in the analogous context of the First Amendment, id., and we see no reason for a different method here.
Our distinguished dissenting colleague asserts that we have imprudently and unnecessarily broken with our sister courts of appeal and infers that we will bear some responsibility for future mass *184 shootings. In our view, inferences of this nature have no place in judicial opinions and we will not respond beyond noting this. The meaning of the Constitution does not depend on a popular vote of the circuits and it is neither improper nor imprudent for us to disagree with the other circuits addressing this issue. We are not a rubber stamp. We require strict scrutiny here not because it aligns with our personal policy preferences but because we believe it is compelled by the law set out in Heller and Chester.
Because the district court did not evaluate the challenged provisions of the FSA under the proper standard of strict scrutiny, and the State did not develop the evidence or arguments required to support the FSA under the proper standard, we vacate the district court’s order as to Plaintiffs’ Second Amendment challenge and remand for the court to apply strict scrutiny in the first instance. This is not a finding that Maryland’s law is unconstitutional. It is simply a ruling that the test of its constitutionality is different from that used by the district court. The State should be afforded the opportunity to develop its case in light of this more demanding standard, and Plaintiffs should be permitted to do so as well. In doing so, the parties may look to “a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require.” Carter I, 669 F.3d at 418.[12]
IV. Equal Protection

. To fire a semi-automatic rifle, the shooter must pull the trigger each time he wishes to discharge a round of ammunition. In other words, a semi-automatic rifle fires “only one round with a single trigger pull.... To fire a subsequent round, the trigger must be released and pulled again.” J.A. 2254. By contrast, an automatic rifle, like an M-16, will continuously discharge rounds "for as long as the trigger [is depressed or] until the magazine is empty.” Id. at 2254-55. No party is challenging the ban on automatic weapons.

. Pre-ban Maryland law required a prospective purchaser of what is now defined as an *169 "assault weapon” to provide information such as his "name, address, Social Security number, place and date of birth, height, weight, race, eye and hair color, signature, driver’s or photographic identification, [and] occupation.” 2003 Maryland Laws Ch. 5, § 2. This information is still required under current Maryland law for individuals wishing to purchase regulated firearms. See Md.Code, Pub. Safety § 5-118(b)(1).

. The term "assault pistol” is defined by reference to a list of 15 semi-automatic pistols, specified by make and model. See Md.Code, Crim. Law § 4-301(c). Handguns are categorized separately by the FSA, see Md.Code, Pub. Safety Code § 5-101(n)(l) (defining handgun as a "firearm with a barrel less than 16 inches in length”), although there certainly are semiautomatic handguns not listed as "assault pistols" under the FSA.
“Copycat weapons” are semi-automatic rifles and shotguns not specifically listed under section 5 — 102(r)(2) but similar in terms of style and features to the listed weapons. See Md.Code, Crim. Law § 4-301(e)(2) (" ‘Copycat weapon’ does not include an assault long gun or an assault pistol.”).

. Maryland’s law does expressly permit its citizens to possess a couple of semi-automatic rifles. For example, it specifically exempts the WWII-era Ml Garand, see Md.Code, Pub. Safety § 5-101(r)(2)(xxxvii), and the AR-15 “H-BAR”, see § 5-101(r)(2)(xv), a heavy barrel iteration of the AR-15, neither of which are popular home defense firearms. Citizens might also legally possess other semi-automatic rifles that are not listed under § 5-101(r)(2), presuming the citizen has sufficient expertise to determine that the firearm does not constitute a "copy” of one of the banned rifles or an "imitation” of the AR-15 pattern semi-automatic rifle. One semi-automatic rifle that apparently passes muster is the AR-IO, see J.A. 210, a firearm that is ill-suited to home defense for some smaller individuals because of its heavy recoil which makes it difficult "to reobtain the target and to quickly and accurately fire subsequent shots if needed.” J.A. 2267.

.The statute defines a "detachable magazine” as "an ammunition feeding device that can be removed readily from a firearm without requiring disassembly of the firearm action or without the use of a tool, including a bullet or cartridge.” Md.Code, Crim. Law § 4 — 301 (f).

. These include Associated Gun Clubs of Baltimore, Inc.; Maryland Shall Issue, Inc.; Ma- *171 lyland State Rifle and Pistol Association, Inc.; National Shooting Sports Foundation, Inc.; and the Maryland Licensed Firearms Dealers Association, Inc.

. The same statutory prohibitions (except as to possession) apply to LCMs. See Md.Code, Crim. Law § 4-305(b).

. Although the dissent faults our conclusion that the AR-15 and other semi-automatic rifles prohibited by Maryland law are not so "dangerous and unusual” that they fall outside of the scope of the Second Amendment, the dissent does not rest on unusual dangerousness grounds.

. Plaintiffs go too far in arguing that once we determine that the prohibited firearms fall within the protective ambit of the Second Amendment, the Act is unconstitutional and our analysis is at an end. Although Heller indicated that the District of Columbia's ban on keeping operable handguns in the home would fail any level of constitutional scrutiny, Heller did not do away with means-end scrutiny for Second Amendment challenges. Heller simply found it unnecessary to decide the applicable level of scrutiny because a ban of handguns, the overwhelming choice of Americans for home defense, was clearly unconstitutional regardless of the standard applied. See Heller II, 670 F.3d at 1265 ("If the Supreme Court truly intended to rule out any form of heightened scrutiny for all Second *179 Amendment cases, then it surely would have said at least something to that effect.”). Accordingly, in most every post-Heller case implicating the Second Amendment, we have assumed that "an appropriate form of means-end scrutiny” will be applied once we determine that a challenged law implicates the Second Amendment. See United States v. Pruess, 703 F.3d 242, 245 (4th Cir.2012); United States v. Carpio-Leon, 701 F.3d 974, 978 (4th Cir.2012); United States v. Carter (“Carter I"), 669 F.3d 411, 416 (4th Cir.2012); United States v. Chapman, 666 F.3d 220, 225 (4th Cir.2012); United States v. Staten, 666 F.3d 154, 158 (4th Cir.2011); Chester II, 628 F.3d at 678. Unless the Supreme Court directs us to the contrary, we will apply "an appropriate means-end scrutiny” to determine whether firearm regulations can apply to acts coming under the protection of the Second Amendment.

. In a Second Amendment challenge, we will not conduct rational-basis review. See Heller, 554 U.S. at 628 n. 27, -128 S.Ct. 2783 (“If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.”).

. Despite my good friend's contrary suggestion, in prohibiting the AR-15 platform or pattern rifles and its copies or imitations, Maryland law is prohibiting an entire class of semi-automatic rifles. Indeed, the district court recognized that the Maryland firearm law "remove[s] a class of weapons” that the plaintiffs want for home defense. J.A. 181 (emphasis added). Even the State’s expert witness refers to the “AR-15 class” of firearms. J.A. 438, Modem sporting rifles using the AR-15 platform or pattern are produced by numerous manufacturers including Colt, Olympic Arms, DPMS, Eagle Arms, Bushmaster, SGW Enterprises, Essential Arms, and Sendra. Although the FSA specifically lists the "Colt AR-15” as a prohibited weapon, the AR-15 style semi-automatic rifles produced by other manufacturers would be prohibited as copies or imitations under Md.Code, Pub. Safety § 5-101(r)(2)(xv). See Friedman v. City of Highland Park, — U.S.—, 136 S.Ct. 447, 193 L.Ed.2d 483 (2015) (Thomas, J., dissenting from the denial of cert.) (describing similar "Assault Weapons” ordinance as “categorically] ban[ning] ... firearms that millions of Americans commonly own for lawful purposes”); see also J.A. 413.

. In light of our decision to remand the Second Amendment claim, we need not address Plaintiffs’ arguments that the district court committed error by granting summary judgment to the State when there were several material facts in dispute, and, by the same token, denying summary judgment to Plaintiffs when the record contained various undisputed material facts that required entry of judgment as a matter of law in favor of Plaintiffs.
Plaintiffs also contest the district court’s denial of their motion to exclude expert and fact testimony offered by the State. Having carefully considered these arguments, we conclude that the district court did not abuse its wide discretion in evidentiary matters by denying the motions and considering the testimony. See United States v. Min, 704 F.3d 314, 324-25 (4th Cir.2013) (decisions under Rule of Evidence 701 reviewed for abuse of discretion); United States v. Wilson, 484 F.3d 267, 273 (4th Cir.2007) (Rule of Evidence 702).