In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-3295

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SELDRICK R. CARPENTER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:18-cr-10009-MMM-JEH-1 — **Michael M. Mihm**, *Judge.*

_____

ARGUED MAY 29, 2024 — DECIDED JUNE 17, 2024

_____

Before EASTERBROOK, BRENNAN, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. The United States Constitution guarantees criminal defendants the right to a jury trial in two places. Section 2 of Article III provides that "[t]he Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." And, for its part, the Sixth Amendment promises that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and

district wherein the crime shall have been committed." This case presents the question whether a supervised release revocation proceeding held under 18 U.S.C. § 3583(e)(3) constitutes the "trial of [a] crime" or a "criminal prosecution" within the meaning of either clause. Agreeing with the district court, we hold that it does not.

## I

### A

Little space need be devoted to the facts. In 2020 Seldrick Carpenter commenced a six-year term of supervised release after completing a federal sentence for distributing fentanyl. For a time, Carpenter complied with his conditions. But following the death of his mother, he began using drugs and lashing out against his probation officer. When efforts to address these issues through behavioral therapy failed, Carpenter's probation officer petitioned to revoke his supervised release. The district court released Carpenter on bond pending a final revocation hearing, only then to see him come under suspicion for setting a car on fire.

### B

The Probation Office alleged that Carpenter committed a litany of supervised release violations, the most serious of which included the offenses of arson, criminal damage to property, intimidation, and aggravated battery. In advance of the revocation hearing, Carpenter moved for a jury trial under the Sixth Amendment and, alternatively, under Article III, § 2, cl. 3. The district court denied the motion and presided over Carpenter's revocation hearing without a jury. In the end, it found Carpenter guilty of several violations and exercised the discretion conferred by 18 U.S.C. § 3583(e)(3) to revoke

Carpenter's supervised release. It then imposed a revocation sentence of 30 months' imprisonment.

Carpenter appeals, challenging the district court's refusal to impanel a jury and failure to recommend that the Bureau of Prisons house him in a specified low-security prison in Michigan.

## II

The constitutional question pressed by Carpenter is important not only because supervised release violations occur with some frequency, but also because of the consequential deprivation of liberty that accompanies revocation. In the final analysis, we conclude that neither the Sixth Amendment nor Section 2 of Article III of the U.S. Constitution guarantee a jury trial in a revocation hearing like Carpenter's. A defendant situated like Carpenter is entitled only to those procedures dictated by the Federal Rules of Criminal Procedure and the Due Process Clause of the Fifth Amendment.

## A

By its terms, the Sixth Amendment applies only to "criminal prosecutions." U.S. Const. amend VI. Carpenter contends that his supervised release revocation met that description. He begins from the observation that "the scope of the constitutional jury right must be informed by the historical role of the jury at common law." *So. Union Co. v. United States*, 567 U.S. 343, 353 (2012) (quotations omitted). From there he seeks to leverage recent scholarly research purporting to show that defendants in the founding era received jury trials in proceedings analogous to today's supervised release revocations. See Jacob Schuman, *Revocation at the Founding*, 122 Mich. L. Rev. (forthcoming 2024).

As Carpenter recognizes, however, his position collides with thirty years of contrary precedent. We have long held that supervised release revocations—whether conducted under § 3583(e)(3) or some other provision—are not "criminal prosecutions" within the meaning of the Sixth Amendment. See *United States v. Boultinghouse*, 784 F.3d 1163, 1171 (7th Cir. 2015) ("[A] revocation proceeding, because it focuses on the modification of a sentence already imposed and implicates the conditional (rather than absolute) liberty that the defendant enjoys as a result of that sentence, is not considered to be a stage of a criminal prosecution."); *United States v. Kelley*, 446 F.3d 688, 691 (7th Cir. 2006) (same); *United States v. Pratt*, 52 F.3d 671, 675 (7th Cir. 1995) (same).

Although our full court could revisit these decisions, they stand today as controlling authority. See *Wilson v. Cook Cty.*, 937 F.3d 1028, 1035 (7th Cir. 2019) ("[P]rinciples of stare decisis require that we give considerable weight to prior decisions." (quoting *McLain v. Retail Food Emp'rs Joint Pension Plan*, 413 F.3d 582, 586 (7th Cir. 2005))). They reflect the court's reasoned judgment on a question of constitutional law, and we would need "compelling reason[s]" to chart a different course. See *United States v. Lamon*, 893 F.3d 369, 372 (7th Cir. 2018) (quotations omitted). Mere disagreement with the law or a desire to see the law change is not enough. See *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005) ("[I]f the fact that a court considers one of its previous decisions to be incorrect is a sufficient ground for overruling it, then stare decisis is out the window, because no doctrine of deference to precedent is needed to induce a court to follow the precedents that it agrees with.").

None of this is lost on Carpenter, who candidly admits that he is asking us to overrule our precedent. In extending that invitation, he directs our attention to the Supreme Court's 2019 decision in *United States v. Haymond*, 139 S. Ct. 2369, which he reads as unsettling and indeed conflicting with our precedent. See *Wilson*, 937 F.3d at 1035 (explaining that a subsequent Supreme Court decision undermining Circuit precedent is a compelling reason to revisit a settled issue). We disagree, at least in the context of supervised release revocations conducted under the authority of 18 U.S.C. § 3583(e)(3).

*Haymond* involved a Sixth Amendment challenge not to § 3583(e)(3)—the provision at issue here—but instead to § 3583(k), a supervised release revocation provision applicable only to defendants required to register under the Sex Offender Registration and Notification Act. In the event such a defendant is found to have committed any one of an enumerated list of sex crimes while on supervised release, § 3583(k) requires district courts to revoke his term of supervised release and impose a revocation sentence of "not less than 5 years."

Andre Haymond had been convicted of possessing child pornography in violation of 18 U.S.C. § 2252(b)(2), an offense that carried a statutory range of 0 to 10 years' imprisonment. See *Haymond*, 139 S. Ct. at 2373. After completing a 38-month prison sentence, he began serving a ten-year term of supervised release. See *id.* While under supervision, Haymond was accused once again of possessing child pornography—one of the offenses covered by § 3583(k). See *id.* At his revocation hearing and on appeal, Haymond argued that § 3583(k) violated the Sixth Amendment by increasing his sentencing exposure based on judge-found facts. See *id.* at 2375; see also

*Alleyne v. United States*, 570 U.S. 99, 116 (2013) (plurality opinion) (holding that "facts that increase mandatory minimum sentences must be submitted to [a] jury"). The Tenth Circuit agreed and held § 3583(k) unconstitutional as applied to Haymond. *Haymond*, 139 S. Ct. at 2375.

The Supreme Court affirmed, but no single opinion commanded the support of five Justices. Writing for three others, Justice Gorsuch relied heavily upon the Court's prior holding in *Alleyne* and concluded that § 3583(k) violated the Sixth Amendment by compelling the district court to find facts triggering a heightened sentencing exposure: a mandatory minimum revocation sentence of five years even though the jury's verdict in Haymond's underlying criminal prosecution did not itself authorize any mandatory minimum. See *id.* at 2378–79. En route to that conclusion, Justice Gorsuch appeared to suggest that—contrary to our precedent—most, if not all, supervised release revocations are "criminal prosecutions" as that term was understood at the founding. See *id.* at 2376 (observing that, historically, "the concept of a 'crime' was a broad one linked to punishment"). The dissenting Justices disagreed. Writing for three others, Justice Alito would have held—consistent with our precedent—that *no* supervised release proceedings are "criminal prosecutions" within the meaning of the Sixth Amendment. See *id.* at 2393–95.

In a solo concurrence Justice Breyer supplied the necessary fifth vote for affirming the Tenth Circuit. See *id.* at 2385–86. He "agree[d] with much of the dissent, in particular that the role of the judge in a supervised-release proceeding is consistent with traditional parole." *Id.* at 2385. But he disagreed with Justice Gorsuch's "transplant" of *Alleyne* "to the supervised-release context." *Id.* Justice Breyer nonetheless then

explained that "three aspects" of § 3583(k) made it "less like ordinary revocation and more like punishment for a new offense, to which the jury right would typically attach." *Id.* at 2386.

> *First*, § 3583(k) applies only when a defendant commits a discrete set of federal criminal offenses specified in the statute. *Second*, § 3583(k) takes away the judge's discretion to decide whether violation of a condition of supervised release should result in imprisonment and for how long. *Third*, § 3583(k) limits the judge's discretion in a particular manner: by imposing a mandatory minimum term of imprisonment of "not less than 5 years" upon a judge's finding that a defendant has "commit[ted] any" listed "criminal offense."

*Id.* "Taken together," Justice Breyer concluded that "these features of § 3583(k) more closely resemble the punishment of new criminal offenses, but without granting a defendant the rights, including the jury right, that attend a new criminal prosecution." *Id.* So Justice Breyer agreed with the plurality—though on purely functional grounds rejected by the plurality—that § 3583(k) was unconstitutional as applied to Andre Haymond. See *id.*

Five Justices in *Haymond* concluded that the Sixth Amendment does apply to some supervised release proceedings. Not surprisingly, then, Carpenter contends that *Haymond* has undermined our precedent and that principles of *stare decisis* must give way to a fresh examination of the scope of the jury trial right guaranteed by the Sixth Amendment. See *Wilson*, 937 F.3d at 1035.

We view *Haymond* differently. Under *Marks v. United States*, 430 U.S. 188 (1977), an opinion of the Supreme Court can bind lower courts even if it failed to garner five votes. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. at 193 (cleaned up). If either Justice Gorsuch's plurality opinion or Justice Breyer's concurrence fits the bill, our role as an inferior court is to apply that decision until the Supreme Court sees fit to overrule it.

No doubt the *Marks* rule can be difficult to apply. See *Nichols v. United States*, 511 U.S. 738, 745 (1994) (acknowledging that the test is sometimes "more easily stated than applied"). But here its application is straightforward. Justice Gorsuch's plurality approach would require that all revocation hearings exposing a defendant to a mandatory revocation sentence be tried to a jury. That is because, in the plurality's view, any revocation sentence a defendant receives "constitutes a part of the final sentence for his crime." 139 S. Ct. at 2380. On this conception of sentencing, any statute that imposes a mandatory minimum revocation would increase a defendant's sentencing exposure within the meaning of *Alleyne*, either by adding to the mandatory minimum Congress prescribed for a defendant's underlying offense or, as in *Haymond*, by imposing a mandatory minimum where before there was none. In either case, the plurality's approach would require that alleged supervised release violations be tried to a jury.

By contrast, Justice Breyer's narrower approach would require a jury trial in only a subset of those cases. It is not enough for the revocation of supervised release to be

mandatory. To trigger the Sixth Amendment, it must have additional characteristics that make it "less like ordinary [supervised release] revocation and more like punishment for a new offense." *Haymond*, 139 S. Ct. at 2386. Justice Breyer's opinion is thus the narrower of the two.

Accordingly, we now join all nine circuit courts to have considered the question and hold that Justice Breyer's concurring opinion controls under *Marks*. See *United States v. Doka*, 955 F.3d 290, 296 (2d Cir. 2020) ("In *Haymond*, Justice Breyer's opinion concurring in the judgment represents the narrowest ground supporting the judgment, and therefore provides the controlling rule."); *United States v. Seighman*, 966 F.3d 237, 242 (3d Cir. 2020); *United States v. Coston*, 964 F.3d 289, 295 (4th Cir. 2020); *United States v. Lipscomb*, 66 F.4th 604, 612 n.11 (5th Cir. 2023); *United States v. Robinson*, 63 F.4th 530, 540 (6th Cir. 2023); *United States v. Childs*, 17 F.4th 790, 792 (8th Cir. 2021); *United States v. Henderson*, 998 F.3d 1071, 1076 (9th Cir. 2021); *United States v. Salazar*, 987 F.3d 1248, 1259 (10th Cir. 2021); *United States v. Moore*, 22 F.4th 1258, 1268 (11th Cir. 2022). Sixth Amendment arguments in this area must therefore be assessed under the framework Justice Breyer supplied in his concurrence.

Turning back to Carpenter's case, Justice Breyer's opinion finds straightforward application. For Justice Breyer, § 3583(k) triggered the Sixth Amendment because it had three characteristics that made it "*less like ordinary revocation* and more like punishment for a new offense, to which the jury right would typically attach." 139 S. Ct. at 2386 (emphasis added). Justice Breyer's functional approach arrays supervised release proceedings along a spectrum. Ordinary revocations—like those conducted under § 3583(e)(3)—lie at one

extreme and do not trigger Sixth Amendment scrutiny. With respect to these revocation proceedings, then, our precedents in *Pratt*, *Kelley*, and *Boultinghouse* remain sound. At the other end of the spectrum lie ordinary criminal prosecutions, which everyone agrees bring with them a right to a jury trial (save the limited exception of petty offenses). Section 3583(k) lies somewhere between these two poles, but close enough to the latter to require a jury trial.

Carpenter's supervised release revocation—held as it was under § 3583(e)(3)—was precisely the kind of "ordinary revocation" that Justice Breyer took care to explain falls outside the scope of the Sixth Amendment. Although that provision vested the district court with the discretion to revoke Carpenter's term of supervised release, it did not obligate it to do so. Even more, the revocation itself did not expose Carpenter to any mandatory revocation sentence: the district court had discretion to fashion a sentence within the applicable statutory maximum. In short, Carpenter's revocation proceeding was not "like punishment for a new offense" within the meaning of Justice Breyer's controlling opinion in *Haymond*. The Sixth Amendment therefore did not compel the district court to empanel a jury to find whether Carpenter committed the alleged violations of supervised release—a result entirely aligned with our existing precedent.

B

In the alternative, Carpenter argues that he was entitled to a jury under Article III, § 2, cl. 3, the Sixth Amendment's lesser-known older cousin. That clause provides that

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall

be held in the State where the said Crimes shall
have been committed; but when not committed
within any State, the Trial shall be at such Place
or Places as the Congress may by Law have di-
rected.

U.S. Const. Art. III, § 2, cl. 3. Picking up on a minor variation
in the phrasing of that clause—it applies to "The Trial of all
Crimes" rather than to "all criminal prosecutions"—Carpen-
ter contends that it can apply to supervised release revoca-
tions even if the Sixth Amendment does not. In short, he
views Article III's jury guarantee as independent from and
broader than that contained in the Sixth Amendment.

Though textually plausible, Carpenter's interpretation
finds no footing in the history of either the Sixth Amendment
or Article III. During the ratification debates, Article III, § 2,
cl. 3 came under attack for failing to expressly safeguard par-
ticular attributes of the common law jury trial. For example,
although the clause guaranteed a jury trial for "all Crimes,"
and designated the venue where those trials must take place,
it did not promise that juries would be drawn from the "vici-
nage" (meaning from the local community). See *Williams v.
Florida*, 399 U.S. 78, 93 & n.35 (1970); *Smith v. United States*, 599
U.S. 236, 246–48 (2023). This omission elicited heavy criticism
in the ratification debates that followed the Constitutional
Convention, see Drew L. Kershen, *Vicinage*, 29 Okla. L. Rev.
801, 816–17 (1976); Akhil Reed Amar, *The Bill of Rights as a
Constitution*, 100 Yale L.J. 1131, 1197 (1991); see also *Smith*, 599
U.S. at 248, and was cause for continued concern during the
early years of the Republic, see *Williams*, 399 U.S. at 94.

Fears surfaced that Article III's generality would permit
the erosion of the historical jury trial in other ways as well.

Some worried that it might "admit[] of a secret trial, or of one that might be indefinitely postponed to suit the purposes of the government." *Schick v. United States*, 195 U.S. 65, 78 (1904). Others were anxious to stamp out infamous British practices, like the use of testimonial hearsay in lieu of live witness testimony. See *Crawford v. Washington*, 541 U.S. 36, 42–47 (2004) (discussing the historical impetus for the Confrontation Clause).

The Sixth Amendment emerged largely to address these and other perceived problems with the general language employed in Article III, § 2. See *Callan v. Wilson*, 127 U.S. 540, 549–50 (1888) (explaining that the ratification of the Sixth Amendment "is to be referred to the anxiety of the people of the states to have in the supreme law of the land … a full and distinct recognition" of certain common law rules); *Williams*, 399 U.S. at 94 (observing that the vicinage issue "furnished part of the impetus for introducing" the Sixth Amendment). In other words, its purpose was remedial in nature—to resolve worries and uncertainties about a particular constitutional provision.

It did so, moreover, without supplanting Article III, § 2, cl. 3. In *Callan*, the Supreme Court rejected the contention that the Sixth Amendment—because it came later in time—superseded its predecessor in Article III, § 2. See 127 U.S. at 548–49. The "letter and spirit of the constitution" supported a contrary view: that the provisions were designed to operate in tandem. *Id.* at 549. Article III, § 2 guarantees a jury in the trial of all crimes, and the Sixth Amendment then gives added content to that guarantee by "declar[ing] … what … rules" apply to those proceedings. *Id.* The Court has treated the two jury guarantees as complementary ever since. See, *e.g.*, *United*

*States v. Johnson*, 323 U.S. 273, 275 (1944) (observing that the Sixth Amendment "reinforced" Article III, § 2, cl. 3); *United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999) (same); *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 210 (2017) ("The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment.").

Carpenter's contention that Article III, § 2 can apply to proceedings outside the scope of the Sixth Amendment turns this history on its head. On his reasoning, the Constitution grants two kinds of jury trials in criminal proceedings: traditional jury trials for criminal prosecutions and a weaker version with less robust protections in an amorphous case of proceedings that fall within the daylight he sees between the phrase "criminal prosecutions" and "trial of all crimes." But we find no support for this view. History and precedent make clear that the Sixth Amendment was meant to complement Article III, § 2, not to supersede or compete with it. In line with this history, we reject Carpenter's interpretation and hold that Article III, § 2, cl. 3 and the Sixth Amendment are identical in scope. Accordingly, a proceeding that does not trigger the Sixth Amendment cannot independently trigger Article III, § 2.

### III

Carpenter presses one additional point targeted at his revocation judgment. At sentencing the district court agreed to recommend that the Bureau of Prisons house Carpenter at FCI Milan, a low-security prison in Michigan. Carpenter's written judgment, however, contains no such recommendation. Carpenter asks us to instruct the district court to correct that oversight. As we explained in *United States v. McHugh*, 528 F.3d 538 (7th Cir. 2008), however, and reaffirm today, we lack

jurisdiction to review such non-binding recommendations on appeal. See *id.* at 540–41.

For these reasons, we AFFIRM.